UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
:
STRUCTURED CAPITAL SOLUTIONS, LLC :
:
Plaintiff, :
:
v. : 15-CV-905 (JSR) (JLC)
:
COMMERZBANK, AG, NEW YORK BRANCH :
:
Defendant. :
------------------------------------------------------------ x

# DECLARATION OF WILLIAM DONOHUE

I, William Donohue, declare as follows:

1. I have been a Director in the Structured Capital Markets group at Commerzbank AG New York Branch since 2009. I have personal knowledge of the following facts, and if called to testify, could and would testify competently thereto.

### I. Confidentiality Agreement between Commerzbank and Societe Generale

2. Attached hereto as Exhibit 1 hereto is a true and correct copy of a Confidentiality Agreement between Commerzbank and Societe Generale dated September 5, 2012. I signed the last page of the Agreement.

### II. The 2013 Transaction

3. On October 5, 2012, Nicholas Sopkin, another member of the Structured Capital Markets group at Commerzbank AG New York Branch, forwarded me by email a draft term sheet that Larry Rosansky of Societe Generale had sent to him. A true and correct copy of this email and attached term sheet is attached hereto as Exhibit 2.

4. I subsequently worked on this transaction throughout the Fall of 2012. This transaction is what the Amended Complaint refers to as the "2013 Transaction."

5. As part of my work on the 2013 Transaction, I had discussions with Larry Rosansky in 2012 concerning the details of the transaction. He explained to me the steps of the transaction, including the barter exchange step, the mark-to-market step, and the delayed delivery of property. He also explained to me the tax consequences of each step and of the overall transaction. He also explained to me the tax, accounting and regulatory capital consequences of the transaction that SG sought to achieve.

6. Attached as Exhibit 3 hereto is a true and correct copy of the Tactics Approval Form dated November 21, 2012 for the 2013 Transaction. I was one of the co-authors of this form. The purpose of the form is to provide an overview of the transaction in order to obtain the approval of the transaction from the Structured Capital Markets group. The "Transaction Overview" section of the document provides an overview of the structure and steps of the 2013 Transaction. As reflected by the signatures on the document, the Structured Capital Markets group approved the transaction on November 21, 2012.

7. Attached as Exhibit 4 is a true and correct copy of an email chain from November and December 2012, in which I participated. The email reflects internal Commerzbank communications regarding various aspects of the 2013 transaction, including the structure and steps of the transaction, the collateral, Commerzbank's credit exposure, market risks, hedging, Commerzbank's expected profits, and the balance sheet and regulatory benefits that Societe Generale would achieve.

8. Based on discussions with Larry Rosansky and my work on the transaction in 2012, I understood in 2012 the tax, accounting, and regulatory capital benefits that Societe

Generale sought to achieve with the 2013 Transaction. In particular, I understood that Societe Generale sought to achieve a regulatory capital benefit by changing the accounting classification of their deferred tax assets. My understanding of these issues is reflected in Exhibit 5, which is a true and correct copy of an email I sent on December 18, 2012 to colleagues in the Structured Capital Markets Group at Commerzbank summarizing the benefits sought by Societe Generale.

9. On December 21, 2012, Commerzbank's Kredit Komitee ("KK") in Germany approved the 2013 Transaction. I communicated the KK approval to Larry Rosansky of Societe Generale the same day. This was the final internal approval needed for the transaction before the Commerzbank Board approval, which occurred on January 8, 2013.

10. Exhibit 6 hereto is a true and correct copy of the KK approval form. I am familiar with this form from my years of working at Commerzbank. It is a form that is created around the time of approval by a person with knowledge of the transaction; it is kept in the course of Commerzbank's regularly conducted business activities; and making the form is a regular practice of Commerzbank's business activities. In the upper right hand corner of Exhibit 6, the December 21, 2012 approval date is indicated. The upper right hand corner also indicates (next to "GVS") that the Board meeting regarding this transaction would occur on January 8, 2013.

11. Exhibit 7 hereto is a true and correct copy of my email dated December 21, 2012 to Larry Rosansky communicating the KK approval.

12. Although Commerzbank was fully approved by January 8, 2013 and prepared to execute the 2013 Transaction imminently, Societe Generale was not able to do so. Accordingly, the execution date was delayed until later in 2013. After the January 8, 2013 Board approval, no significant changes were made to the transaction, and no further internal approvals were sought or obtained.

13. The 2013 Transaction was executed on April 23, 2013. Attached as Exhibit 8 hereto is a true and correct copy of the Confirmation for the 2013 Transaction, dated April 23, 2013, which reflects its terms.

14. The 2013 Transaction involved a barter exchange agreement whereby (a) Commerzbank delivered to Societe Generale $1.3 billion of 10-Year U.S. Treasury Notes on Day 1 of the transaction; (b) Societe Generale delivered to Commerzbank $100 million in cash on Day 1 of the transaction; and (c) Societe Generale delivered to Commerzbank, six months later, $1,211,489,00 of U.S. Treasury Notes maturing in 2016. Societe Generale was the principal party in the transaction (meaning that it obtained any tax, accounting, and regulatory benefits) while Commerzbank was the financial counterparty (meaning that it did not earn those benefits, and simply earned revenues for executing the transaction).

15. Commerzbank's objective in the 2013 Transaction was to earn approximately $4 million net for participating in a capital markets transaction in which it had uncollateralized credit exposure to SG in the amount of about $120 million for six months.

### III. Information Use and Disclosure Agreement Between SCS and Commerzbank Dated January 14, 2013

16. SCS and Commerzbank executed an Information Use and Disclosure Agreement dated January 14, 2013 ("IUDA"). Attached as Exhibit 9 hereto is a true and correct copy of the IUDA. I did not sign the agreement, but I received an executed copy around the time it was signed.

17. When the IUDA was executed, I did not know what information SCS was planning to provide.

## IV. SCS Presentation to Commerzbank

18.     On January 29, 2013, Adam Parr of SCS sent me and others an email attaching a Powerpoint presentation entitled "Asset Acquisition Structures." A true and correct copy of this email and presentation is attached as Exhibit 10.

19.     Upon review of the SCS Powerpoint presentation, I recognized the core elements of the "Deferred Asset Delivery" section of the presentation as being very similar to the 2013 Transaction, which I had already been discussing and working on with Societe Generale, as described above. Specifically, I already knew the core steps and structure of the "Deferred Asset Delivery" section of the presentation from my work on the 2013 Transaction. I also already understood how the tax basis of the "Acquired Assets" is affected upon each step of the transaction, and how the "mark to market step" triggers a taxable gain on the "Acquired Assets," and how the DAD Transaction could facilitate reclassification of one kind of Deferred Tax Asset ("DTA") to another kind for accounting purposes. I did not have prior knowledge of the information in the "Moving to Affiliate" or "Security Arrangements" section.

20.     Attached as Exhibit 11 is a true and correct copy of an email dated February 6, 2013, which I sent to Steven Horowitz, a colleague in the Structured Capital Markets group at Commerzbank, concerning the SCS presentation. In the email, I stated: "They have 2 ideas. First is sg trade and second is db trade." In the email, I was referring to the fact that I already knew the core elements of the information in the "Deferred Asset Delivery" section of the presentation based on my work on the 2013 Transaction (as described in Paragraph 19 above).

21.     During an in-person meeting with SCS on February 6, 2013, I do not recall SCS providing any information orally that differed from the SCS presentation.

## V. The 2014 Transaction

22. I worked on the "2014 Transaction" (as that term is used in the Amended Complaint).

23. The goal of the 2014 Transaction was to facilitate the future monetization with third party counterparties of net operating losses incurred by the New York branch of Hypothekenbank Frankfurt AG ("HFNY") (formerly known as Eurohypo AG), a Commerzbank AG subsidiary.

24. Commerzbank intended to close HFNY, and, absent any other transactions, upon closure the losses that HFNY had incurred through normal business operations would have lost their value as potential tax deductions.

25. To achieve the desired business results, Commerzbank wanted to move HFNY's losses into a non-bank, non-broker dealer entity. Transferring the losses to the New York branch of Commerzbank was not useful, because it already had a significant amount of tax losses and future monetization of any losses with third party counterparties would be almost impossible. Commerzbank therefore organized a special-purpose vehicle, Eschborn Capital LLC ("Eschborn"), into which HFNY's losses were moved.

26. The 2014 Transaction was executed on February 11, 2014 between Commerzbank, Eschborn, and Societe Generale. Through a series of tax elections and steps including a delivery of a forward U.S. Treasury portfolio, the expected result is that approximately $140 million of HFNY's net operating losses were transferred to Eschborn in the form of short-term bonds that had a tax basis above market value. This resulted in expected amortizable bond premium being generated within Eschborn.

6

27. This had the expected effect of preserving an equivalent amount of losses within Eschborn as ordinary losses rather than capital losses. Absent the amortizable bond premium strategy developed by Commerzbank, the losses within Eschborn would have been almost entirely treated as capital losses. As a business matter, capital losses would have been useless to Commerzbank because Eschborn did not generate capital gains that could be offset by capital losses.

28. Commerzbank paid Societe Generale approximately $4 million for acting as the financial counterparty in the 2014 Transaction.

29. The next step towards Commerzbank's objective was, and still is, the monetization of the losses through the issuance to third parties of preferred shares in Eschborn. To date, Commerzbank has been unable to consummate any such transactions with third parties. Commerzbank therefore has not realized any economic benefit in connection with the 2014 Transaction. Rather, Commerzbank has lost money on the transaction because of the $4 million it paid to Societe Generale, plus fees to legal advisors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 4, 2015 in New York, New York.

_William Donohue_
William Donohue