FILED UNDER SEAL—CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED CAPITAL SOLUTIONS, LLC | Civil Action No.: |
| Plaintiff, | 1:15-cv-00905 (JSR) (JLC) |
| v. | |
| COMMERZBANK, AG, NEW YORK BRANCH | **FILED UNDER SEAL** |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FILED UNDER SEAL—CONFIDENTIAL

## **Table of Contents**

Table of Authorities ................................................................................................. iii

Preliminary Statement ............................................................................................. 1

Factual Background ................................................................................................. 3

    A.  The DAD Technology ..................................................................................... 3

    B.  SCS Disclosed the DAD Technology to SG ................................................. 3

    C.  SG's Dealings with Commerzbank ............................................................... 3

    D.  The Information Use and Disclosure Agreement .......................................... 4

    E.  Commerzbank's Post-Disclosure Communications with SCS ..................... 4

    F.  The 2013 Transaction .................................................................................... 5

    G.  Commerzbank's Fraudulent Misrepresentation ........................................... 5

    H.  The 2014 Transaction .................................................................................... 6

Argument ................................................................................................................ 7

I.   Summary Judgment is Unwarranted on the Breach Claims; the IUDA is
    Valid and There is Ample Evidence Commerzbank Breached It ........................ 8

    A.  The IUDA is a Valid, Enforceable Contract ................................................ 8

        1. There is Substantial Evidence of Novelty ............................................. 9

        2. Commerzbank Did Not Independently Obtain the DAD Technology ... 12

        3. The IUDA is Supported by Consideration Other Than the Disclosure of
           SCS's DAD Technology ...................................................................... 13

        4. The IUDA's Fee Provision is Not Indefinite ........................................ 14

    B.  Commerzbank Breached the IUDA .............................................................. 16

        1. Commerzbank Breached Section 6 of the IUDA .................................. 16

        2. Commerzbank Breached Section 7 of the IUDA .................................. 19

        3. Commerzbank Breached Section 3 of the IUDA .................................. 19

FILED UNDER SEAL—CONFIDENTIAL

## **Table of Contents**
### **(Continued)**

    C.  Commerzbank Waived its Right to Dispute the Novelty of the Information ............19

II.  Summary Judgment is Unwarranted on the Misappropriation Claim
Because SCS Took Sufficient Measures to Maintain the Secrecy of the
DAD Technology.................................................................................................20

    A.  SCS Adequately Maintained the Secrecy of Its Information......................21

    B.  SCS's Boilerplate Disclaimers Do Not Destroy Confidentiality...............22

III. The unjust enrichment claim is viable in the alternative ....................................24

IV. Summary judgment is unwarranted on the fraud claim; there is sufficient
evidence of reliance and intent ...........................................................................24

    A.  SCS Reasonably Relied on Commerzbank's Misrepresentation................24

    B.  There is Sufficient Evidence of Fraudulent Intent to Create a Triable
Issue of Fact .............................................................................................25

Conclusion ...............................................................................................................25

FILED UNDER SEAL—CONFIDENTIAL

## Table of Authorities

**Cases**                                                               **Page(s)**

*AEB & Associates Design Group, Inc. v. Tonka Corp.*,
   853 F.Supp. 724 (S.D.N.Y. 1994) ...................................................................12

*Apfel v. Prudential-Bache Securities Inc.*,
   81 N.Y.2d 470 (1993) ...........................................................................13–14

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
   2015 WL 4940126, at \*12 (S.D.N.Y. Aug. 10, 2015)............................................24

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
   1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...........................................................21–22

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
   74 N.Y.2d 475 (1989) ...........................................................................15

*Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*,
   759 F.2d 1053 (2d Cir. 1985) ...................................................................21

*DLJ Mortgage Capital Corp. v. Fairmont Funding, Ltd.*,
   920 N.Y.S.2d 1 (1st Dep't 2011) ...............................................................20

*EchoStar Satellite, LLC v. ESPN, Inc.*,
   79 A.D.3d 614 (1st Dep't 2010) ...............................................................20

*Edelman v. Starwood Capital Grp., LLC*,
   892 N.Y.S.2d 37 (1st Dep't 2009) .............................................................21

*Gibson v. Am. Boad. Co., Inc.*,
   892 F.2d 1128 (2d Cir. 1989) ...................................................................7–8

*High v. Trade Union Courier Pub. Corp.*,
   69 N.Y.S.2d 526 (N.Y. Sup. Ct. 1946) .........................................................18

*Julie Research Labs., Inc. v. Select Photographic Eng'g, Inc.*,
   810 F.Supp. 513 (S.D.N.Y. 1992) ..............................................................21

*Keller v. Am. Chain Co.*,
   255 N.Y. 94 (1930) .............................................................................18

*Lehman v. Dow Jones & Co.*,
   783 F.2d 285 (2d Cir. 1986) ...................................................................21

FILED UNDER SEAL—CONFIDENTIAL

**<u>Table of Authorities</u>**
**(Continued)**

**Cases**                                                                          **Page(s)**

*Mencher v. Weiss*,
    306 N.Y. 1 (1953) ................................................................................................14

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
    208 F.3d 368 (2d Cir. 2000) ..................................................................7, 10, 12

*N. Atl. Instruments, Inc. v. Haber*,
    188 F. 3d 38 (2d Cir. 1999) ....................................................................................20

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    726 F. Supp. 2d 291 (S.D.N.Y. 2010) ........................................................12–13

*Vantage Point, Inc. v. Parker Bros.*
    529 F.Supp 1204 (E.D.N.Y. 1981) ..................................................................12

FILED UNDER SEAL---CONFIDENTIAL

Plaintiff Structured Capital Solutions, LLC ("SCS") respectfully submits this Memorandum of Law[1] in opposition to Defendant's motion for summary judgment.

## PRELIMINARY STATEMENT

This lawsuit arises from Commerzbank, AG, New York Branch's ("Commerzbank") unlawful use of a transaction structuring concept developed by SCS, and which was presented by SCS to Commerzbank pursuant to an Information Use and Disclosure Agreement (the "IUDA"). The transaction structuring concept at issue, the Deferred Asset Delivery Transaction (the "DAD Transaction"), and related information (together with the DAD Transaction, the "DAD Technology"), was developed by SCS in 2009, and subsequently elaborated and further developed until it was formally disclosed to Commerzbank on January 29, 2013.

The IUDA expressly required Commerzbank to notify SCS if it believed it already knew any of the information. Commerzbank never did so. Instead, Commerzbank met with SCS several times, asked questions about the DAD Technology, and otherwise gave every indication that the information was novel to Commerzbank.

The IUDA also prohibited Commerzbank's ability to transact based on the information—unless Commerzbank first entered into a fee agreement with SCS. Commerzbank never entered into a fee agreement, and instead executed two transactions in breach of the IUDA.

In early 2013—after receiving SCS's DAD Technology—Commerzbank began to plan a transaction based on, and including the key concepts of, SCS's DAD Technology. Commerzbank executed this transaction with Société Générale ("SG"), on February 11, 2014 (the "2014

---

[1]    Plaintiff's Memorandum of Law is accompanied and supported by the declarations of Paul Edwards, dated September 18, 2015 ("Edwards Decl."), Adam V. Parr, dated September 18, 2015 ("Parr Decl."), Marc H. Fuhrman, dated September 17, 2015 ("Fuhrman Decl."), and Jefferson Read, dated September 21, 2015 ("Read Decl.").

FILED UNDER SEAL—CONFIDENTIAL

Transaction"). Commerzbank "took [SCS's] idea and added to it to come up with our idea." (SMF[2] ¶ 190.)

Separately, several months after executing the Agreement—in April 2013—Commerzbank executed a transaction with SG ("2013 Transaction") that was based entirely on SCS's DAD Transaction.

Both the 2013 and 2014 Transactions generated substantial benefits for Commerzbank.

Commerzbank now claims both that it knew substantially all of SCS's DAD Technology prior to entering into the IUDA, and that it *didn't know* what information it had bargained for when executing the IUDA. These claims are undermined by the record in this case.

Commerzbank met with SG on November 8, 2012 and allegedly discussed SCS's DAD Technology. Then, *the very next day* Commerzbank met with SCS and received SCS's marketing pitch, where SCS described, at a general level, what information would be disclosed pursuant to the IUDA. Commerzbank nonetheless went on to seek disclosure of SCS's DAD Technology by negotiating the IUDA with SCS.

At best, the record reflects that Commerzbank was aware of *some*—but by no means all—of SCS's DAD Technology, but did not fully understand the information, and therefore sought full disclosure and consultation from SCS. Commerzbank's optimistic spin on the evidence does not, however, meet the exacting standards for summary judgment. Rather than establish its entitlement to judgement as a matter of law because of the *absence* of disputed material facts, Commerzbank relies heavily on deeply contested questions of fact, not the least of

---

[2]     In citations, "SMF" refers to Pl.'s Local Rule 56.1 Statement of Material Facts, "DF" refers to Def.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, "Mem." refers to Def.'s Mem. of Law in Supp. of its Mot. for Summ. J.

FILED UNDER SEAL—CONFIDENTIAL

which is whether, and to what extent, Commerzbank knew SCS's DAD Technology prior to SCS's disclosure. Commerzbank's motion for summary judgment should therefore be denied.

## FACTUAL BACKGROUND

### A. The DAD Technology

SCS's DAD Transaction is a multi-step sequence of capital markets transactions that can generate significant tax, regulatory, and/or accounting benefits. (SMF ¶¶ 156–158, 174–177.) The sequence of the steps, as well as the type of assets used is of paramount importance to the success of the DAD Transaction. A transfer of the transaction assets between corporate affiliates is possible, without affecting tax attributes. Thus, the DAD Transaction enables the NOLs of one affiliated entity to be transferred to another affiliated entity. (SMF ¶¶ 157, 158.)

Importantly, in addition to the DAD Transaction structure, the DAD Technology also includes other elements, such as a new source of financing, the ability to manage risk, the ability to change the investment profile of the parties, the ability to take speculative positions, the ability to transfer assets to an affiliate to better deploy limited capital, as well as the achievement of important regulatory capital and accounting treatment benefits that directly affect the profit and capital position of the principal party. (SMF ¶¶ 227–230.)

### B. SCS Disclosed the DAD Technology to SG

On May 15, 2011, SCS and SG entered into a non-disclosure agreement (SMF ¶ 180.) Subsequently, SCS disclosed some of its DAD Technology to SG and advised SG regarding the information. (*Id.*)

### C. SG's Dealings with Commerzbank

On September 5, 2012, SG entered into a confidentiality agreement with Commerzbank. (SMF ¶ 183.) At some point in 2012, Société Générale allegedly shared information about the structure of the 2013 Transaction with Commerzbank. (Mem. at 13.) On November 8, 2012,

FILED UNDER SEAL—CONFIDENTIAL

Commerzbank's Structured Capital Markets team met with SG to discuss Commerzbank's role as an accommodation party in the 2013 Transaction. (SMF ¶ 184.)

As late as December 19, 2012, Commerzbank did not fully understand the DAD Technology, and based on their incomplete understanding, did not think the DAD Transaction would work for Commerzbank. (SMF ¶ 186.)

### D.  The Information Use and Disclosure Agreement

In late 2012, Commerzbank and SCS entered into discussions regarding services or transaction structures of potential interest to Commerzbank, and an introductory meeting was held in London. (SMF ¶ 142.) Following this introductory meeting, SCS and Commerzbank's Structured Capital Markets group met in New York on November 9, 2012 for a more detailed pitch meeting, where SCS marketed its advisory services, and its DAD Transaction structure information and ideas to Commerzbank. (SMF ¶¶ 185, 232.) During this meeting, SCS described some of the ideas, features, and benefits of the DAD Technology at a general level. (SMF ¶¶ 143, 152.) Additionally, SCS informed Commerzbank that SCS was working with Rosansky at SG on a DAD Transaction. (SMF ¶ 232.)

Commerzbank expressed its intent to obtain SCS's services and disclosure of the DAD Technology. (SMF ¶ 144.) The parties, with the involvement of Commerzbank's internal counsel, Christopher Williams, began to negotiate a written agreement by exchanging drafts of what would become the IUDA. (SMF ¶¶ 146, 159.) SCS and Commerzbank entered into the IUDA in January 2013. (SMF ¶ 150.)

### E.  Commerzbank's Post-Disclosure Communications with SCS

Following the execution of the IUDA by Commerzbank, SCS provided Commerzbank with information relating to SCS's DAD Technology, met with Commerzbank on several occasions, and engaged in multiple telephonic conference calls, in order to advise Commerzbank

4

FILED UNDER SEAL—CONFIDENTIAL

and answer questions both about the DAD Technology, as well as Commerzbank's specific needs. (SMF ¶¶ 153, 154, 167, 235, 236.)

On January 29, 2013, SCS sent Commerzbank a comprehensive presentation document entitled "Asset Acquisition Structures," which described the DAD Technology.[3] (SMF ¶ 153.)

On February 6, 2013, SCS met with the Commerzbank deal team at Commerzbank's New York offices to discuss the presentation and other related information. (*Id.*) At this meeting, Commerzbank was able to—and did—ask SCS questions about whatever it wanted to know about the DAD Technology. (SMF ¶¶ 154; 235.) After the February 6, 2013 meeting SCS held other meetings or telephone conferences, where SCS explained details of the DAD Technology and SCS's transaction structuring ideas, answered additional questions posed by Commerzbank, and advised Commerzbank on transaction structuring strategies. (SMF ¶¶ 167; 236.)

### F. The 2013 Transaction

On April 23, 2013—well after the execution of the IUDA—Commerzbank served as an accommodation party to a DAD Transaction with SG (the "2013 Transaction"). (SMF ¶ 187.) The 2013 Transaction was a DAD Transaction. That is, it contained the distinctive core steps and sequencing of SCS's DAD Transaction structure, (SMF ¶¶ 192–194.)

### G. Commerzbank's Fraudulent Misrepresentation

At a meeting with Paul Burrows in April 25, 2013—two days after the 2013 Transaction was executed—Burrows told SCS that Commerzbank had been the accommodation party on the 2013 Transaction with SG. When asked what the size of the deal was, Burrows represented it was $150 million. (SMF ¶ 233; DF ¶ 102). Burrows now claims he was referring to the credit

---

[3]     SCS "Asset Acquisition Structures" document also described another transaction structure, the Contingent Payment Debt Instrument structure, which is not at issue in this case.

FILED UNDER SEAL—CONFIDENTIAL

exposure after collateral. (DF ¶ 105.) The credit exposure for the 2013 Transaction, however, was $120 million, (DF ¶ 72.) Commerzbank and SG were, at this time, working closely together on DAD Transactions, and have coordinated regarding SCS. (SMF ¶ 207.)

In 2013, SG and SCS reached a settlement in the amount of $675,000 relating to SG's use of SCS's DAD Technology. (DF ¶ 122.) SCS was unable to obtain any information on the 2013 Transaction from SG. (DF ¶ 119) SCS relied, to its detriment, on Burrows's misrepresentation of the 2013 Transaction's size. (SMF ¶¶ 224–226.)

### H. The 2014 Transaction

Hypothekenbank Frankfurt ("HF") is a wholly-owned subsidiary of Commerzbank. HF's New York Branch ("HF NY") had over $900 million in net operating losses. (SMF ¶¶ 213, 214.) For approximately seven or eight years prior to 2014, Commerzbank had attempted to devise a transaction structure that would enable Commerzbank to move losses from HF NY to an affiliated entity. (SMF ¶ 215.)

The goal of moving or rescuing tax losses from HF NY took on new urgency when it was determined that HF NY would be closed. (DF ¶ 132; SMF ¶¶ 213, 216.) The banks' restructuring efforts relating to HF, and the closing of HF NY, were referred to internally as "Project Red Apple." (SMF ¶ 216.) If Commerzbank could not move the tax losses from HF NY before it was closed, those losses would be permanently lost. (SMF ¶ 213.) Adding to the urgency was the fact that, in 2012, Commerzbank's Structured Capital Markets group in New York did not close a single transaction. (SMF ¶ 148.) In management's assessment, the New York group was underperforming. (SMF ¶ 149.)

Though Commerzbank served as an accommodation party to SG for the 2013 transaction, as late as December 19, 2012, Commerzbank did not think it was able to conduct a DAD-type

FILED UNDER SEAL—CONFIDENTIAL

transaction as principal for its own account. (SMF ¶ 186.) Only after receiving SCS's DAD Technology, and after being advised by SCS that the DAD technology could be used to move net operating losses to a corporate affiliate—did Commerzbank begin to plan a DAD Transaction that would move some of HF NY's tax losses to an affiliated entity, where the tax attribute could be preserved for future use. (SMF ¶¶ 200, 201, 204, 205.) This transaction was eventually executed on February 11, 2014, with SG serving as an accommodation party ("2014 Transaction"). (SMF ¶ 199.)

The 2014 Transaction was a DAD Transaction: it involved the core steps, elements, and sequencing of the DAD Transaction structure. (SMF ¶¶ 181, 188, 200, 202, 205, 208–210.) Rosansky, who worked on both the 2013 and 2014 Transactions at SG, recognized that the 2014 Transaction was fundamentally SCS's DAD Transaction, because it contained the DAD Transaction's distinctive elements. (SMF ¶¶ 181, 188, 202.) Sopkin, the head of Commerzbank's Structured Capital Markets New York team, (SMF ¶ 151), wrote that Commerzbank "took their [i.e., SCS's] idea and added to it to come up with our idea." (SMF ¶ 190.) Drafts of internal Commerzbank approval forms included an estimated $1 million in fees payable to SCS in connection with the 2014 transaction, stating: "we have an NDA in place [with SCS] regarding certain aspects of the transaction." (SMF ¶ 205.)

## **ARGUMENT**

"Summary Judgment is appropriate only where there is no genuine issue of material fact." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000). "The burden of demonstrating the lack of any genuine unresolved issues of fact rests on the moving party. Uncertainty as to the true state of any material fact defeats the motion." *Gibson v. Am. Boad. Co., Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989) (citations omitted). "Because granting the motion deprives a party of its day in court and the right to present its cause to a [factfinder], the district

FILED UNDER SEAL—CONFIDENTIAL

court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Id.*

## I. SUMMARY JUDGMENT IS UNWARRANTED ON THE BREACH CLAIMS; THE IUDA IS VALID AND THERE IS AMPLE EVIDENCE COMMERZBANK BREACHED IT.

Commerzbank seeks judgement on SCS's breach claims on the ground that the IUDA is not a valid, enforceable contract. (Mem. at 17–20.) Even if the IUDA is valid, Commerzbank contends it is entitled to judgement for a number of other reasons: first, that SCS's DAD Technology is not covered by the IUDA, (*id.* at 12–14); second, that the IUDA's "Fee Agreement" provision does not require a fee agreement with SCS, (*id.* at 15–17); and third, that the 2013 Transaction is beyond the scope of the IUDA, (*id.* at 20–21). For the reasons below, all these contentions are mistaken.

### A. The IUDA is a Valid, Enforceable Contract.

Commerzbank contends that SCS's disclosure cannot suffice as consideration for the IUDA. This argument fails because the record contains ample evidence upon which a reasonable factfinder could conclude that Commerzbank did not know the DAD Technology, or did not fully understand some or all portions of it. At best, the record is unclear as to what portions of the DAD Technology were known to Commerzbank.

Moreover, it is undisputed that Commerzbank did not independently obtain whatever portions of the DAD Technology it claims to have known. It did not develop the knowledge itself or obtain it from an unrelated third party. Instead, it allegedly obtained it from SG, who it turn had obtained it from SCS under a confidentiality agreement—a fact of which Commerzbank was aware.

FILED UNDER SEAL—CONFIDENTIAL

Regardless of the novelty of SCS's disclosure to Commerzbank, the IUDA is supported by sufficient other consideration, including the provision of advisory services, consultation regarding aspects of the DAD Technology, and the introduction of potential counterparties.

Last, the IUDA's fee provision is no bar to its enforcement.

### 1. There is Substantial Evidence of Novelty.

Commerzbank cannot conclusively establish that the DAD Technology was not novel to it at the time of SCS's disclosure, and ignores several sources of evidence tending to show novelty: first, SCS disclosed information to Commerzbank that SG never received; second, there is evidence that Commerzbank did not fully understand the DAD Technology; third, Commerzbank did not develop the 2014 Transaction until after SCS's disclosure; fourth, Commerzbank never notified SCS of its prior knowledge; and fifth, Commerzbank knew what it was bargaining for when it entered into the IUDA.

Even accepting Commerzbank's claim that SG disclosed to Commerzbank all the portions of the DAD Technology that SG had, it is clear that SCS disclosed novel information to Commerzbank. This is so for the simple reason that SCS disclosed a different set of information to Commerzbank than it did to SG—including significant information that SG had never seen, and therefore could not have disclosed to Commerzbank. (SMF ¶ 237.)

Donohue admitted that he "did not have prior knowledge of the information in the 'Moving to Affiliate' or 'Security Arrangements' section" of SCS's presentation. (SMF ¶ 238.) To the extent that Kozak now claims prior knowledge that the DAD Transaction could enable the transaction assets to be moved to an affiliate, that claim is undermined by an e-mail sent by Dohonue shortly after receiving SCS's disclosure, in which he writes:

> [SCS] have 2 ideas. […] Both work to pop a gain so we are half way there. Moving the loss down seems straight forward but leon [Kozak] hasn't weighed in yet. Interesting dynamic since *it's not his idea.*

9

FILED UNDER SEAL—CONFIDENTIAL

(SMF ¶ 239) (emphasis added). Additionally, as of December 19, 2012, Commerzbank believed that "this type of trade isn't really going to work for us," because it had a full valuation allowance on its deferred tax assets. (SMF ¶ 186.) This reflects that Commerzbank had, at best, an incomplete grasp on the DAD Technology prior to SCS's disclosure.

The temporal relationship between SCS's disclosure and Commerzbank's development of the 2014 Transaction provides additional evidence of novelty. In *Nadel*, the Second Circuit "conclude[d] that there exist[ed] a genuine issue of material fact as to whether Nadel's idea was, at the time he disclosed it […] novel to Play-By-Play. Notably, the timing of Play-By-Play's development and release of Tornado Taz in relation to Nadel's […] disclosure [was], taken alone, highly probative." 209 F.3d at 381. Such timing exists here as well: Commerzbank did not start work on the 2014 Transaction until after SCS's disclosure. (SMF ¶¶ 205, 240.). This chronology is, by itself—and especially in light of evidence that Commerzbank did not fully understand the DAD Technology prior to SCS's disclosure—sufficient to raise an inference that SCS presented Commerzbank with novel information, causing Commerzbank to pursue the 2014 Transaction.

The *Nadel* Court also found significant the fact that, "although custom in the toy industry provides that a company shall promptly return all samples if it already possesses (or does not want to use) a disclosed idea, Play-By-Play […] failed to return Nadel's prototype […] for several months […]." 209 F.3d at 381. In this case, the Court need not resort to industry custom, for the IUDA expressly required Commerzbank to "promptly notify" SCS if it believed it already possessed any portion of the DAD Technology. (DF ¶ 80.) As discussed in greater detail in Part I.B.2, below, Commerzbank never notified SCS that it knew any aspect of the information SCS disclosed, even though it understood this requirement, and discussed its disclosure obligations

FILED UNDER SEAL—CONFIDENTIAL

internally. Commerzbank's failure—in spite of a clear, affirmative duty—to notify SCS of any prior knowledge, is alone a sufficient basis for a reasonable factfinder to determine that SCS's disclosure was novel to Commerzbank.

Lastly, Commerzbank knew what it was buying. Indeed, the record suggests not that Commerzbank knew SCS's DAD Technology, but rather that SG may have revealed some aspects of it to Commerzbank, and that Commerzbank then deliberately sought out more information from the original source: SCS.

The IUDA was not executed by Commerzbank until it had met with SCS several times. (SMF ¶¶ 142, 231, 232). On November 9, 2012—the day following a meeting between Commerzbank and SG—SCS held a meeting with Commerzbank's New York Structured Capital Markets group. (SMF ¶¶ 231, 232.) At this meeting, SCS pitched Commerzbank its information and services, informing Commerzbank about several important aspects of the structures, including that the transaction created a tax basis above FMV in an asset that could be moved to another entity, that the transaction was tax-neutral from the accommodation party's perspective, and that the transactions would trigger tax gains and result in positive financing, accounting and regulatory capital consequences. (SMF ¶ 143.) SCS also disclosed to Commerzbank—prior to the execution of the IUDA—that SCS had been working with Rosansky at SG on the DAD Transaction. (SMF ¶ 145.)

In short, SCS needed to disclose enough information to Commerzbank in order to *entice* Commerzbank to contract with SCS. Commerzbank did not execute the IUDA based merely on representations that SCS would disclose "something" novel and useful.[4] Commerzbank did not blindly assent to the IUDA's terms. Rather, based on pre-IUDA disclosures, Commerzbank—a

---

[4]    Commerzbank's example purporting to illustrate the "absurdity of SCS's position," (Mem. at 16), is therefore inapposite.

11

FILED UNDER SEAL—CONFIDENTIAL

sophisticated banking and financial services company—was in a position to sufficiently evaluate the potential value of SCS's transaction structuring information and ideas.

Commerzbank's ambiguous and incomplete evidence as to whether, and to what extent, Commerzbank knew the DAD Technology does not compel a finding that, as a matter of law, SCS cannot establish the novelty requisite to supply consideration for the IUDA.

### 2. Commerzbank Did Not Independently Obtain SCS's DAD Technology.

Setting aside the uncertainty as to what Commerzbank knew at the time of SCS's disclosure, it is clear that any portion of SCS's DAD Technology that Commerzbank might have known prior to SCS's disclosure was not obtained independently. Commerzbank alleges it received SCS DAD Technology from SG. (Mem. at 13–14.) SG was under a confidentiality agreement with SCS at the time of the alleged disclosure. (SMF ¶ 180.) Moreover, there can be no doubt that SG obtained the information from SCS. (SMF ¶¶ 193, 194.)

The requirement that the information be known independently of the disclosing party is established by *Nadel* and other 'submission-of-idea' cases. *See Nadel*, 209 F.3d at 380 n.10 ("where there is an *independent source* for the idea used by the defendant, there may be no breach of contract.") (citation omitted) (emphasis added); *see also AEB & Associates Design Group, Inc. v. Tonka Corp.*, 853 F.Supp. 724, 734 (S.D.N.Y. 1994) (discussing the development of a concept "by wholly independent means" in the context of misappropriation) (citation omitted); *Vantage Point, Inc. v. Parker Bros.*, 529 F.Supp 1204, 1215–16 (E.D.N.Y. 1981) (plaintiff's board game idea misappropriated by a third party, who submitted it to defendant)

Commerzbank cites to *Sokol*, claiming that "the defendant [in that case] had earlier obtained the information from a third party [that] itself obtained the idea from the plaintiff […] which is also the case here." (Mem. at 18.) The facts of *Sokol*, however, are that the defendant obtained the information from Falcon "a Canada-based oil company at which Plaintiff Sinclair

FILED UNDER SEAL—CONFIDENTIAL

was the Financial Director." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 296 (S.D.N.Y. 2010). The plaintiff left Falcon, took Falcon's information with him, and later attempted to sell it to the defendant. *Id.* at 296–299. That is not "the case here." Here, Commerzbank allegedly received information from SG that it knew originated from SCS, (SMF ¶¶ 145, 194), while SG was under a confidentiality agreement with SCS, (SMF ¶ 180), and then entered into the IUDA in order to obtain fuller, and additional, disclosure from SCS.

### 3. The IUDA is Supported by Consideration Other Than the Disclosure of SCS's DAD Technology

Consideration for the IUDA does not rest solely on SCS's disclosure of information to Commerzbank following the execution of the agreement. The novelty of a submitted idea "is not a discrete supplemental requirement, but simply part of a plaintiff's proof of […] the validity of the consideration in a claim based on contract theory." *Apfel v. Prudential-Bache Securities, Inc.*, 81 N.Y.2d 470, 477 (1993). Even if the Court determines, as a matter of law, that SCS's disclosure was not novel, the IUDA is supported by other consideration, namely SCS's undertaking to advise and consult with Commerzbank, and to introduce counterparties to Commerzbank "where appropriate." (DF ¶ 74.)

The plain language of the IUDA makes this additional consideration clear. The IUDA states that the agreement is "in consideration of the foregoing recitals," (SMF ¶ 241), among which is that Commerzbank "wishes to be advised by SCS and to engage in discussions for the purpose of [Commerzbank] evaluating potential transactions and where appropriate have SCS introduce potential counterparties." (DF ¶ 74.) Elsewhere the IUDA obliges SCS to provide Commerzbank "a summary presentation entitled 'Asset Acquisition Structures'" and "additional confidential information […] regarding and expanding upon such information." (DF ¶ 75) The IUDA thus reflects that Commerzbank bargained not just for SCS's DAD Technology, but also

13

FILED UNDER SEAL—CONFIDENTIAL

for SCS's skills and expertise—in the form of advisory services—and for the advantage of SCS's connections in the structured finance industry, namely the potential that SCS might, "where appropriate," be able to introduce a counterparty to Commerzbank.[5]

The adequacy of consideration is for the parties, not the Court to determine. *Mencher v. Weiss*, 306 N.Y. 1, 8 (1953) ("the law does not weigh the quantum of consideration"); *Apfel*, 81 N.Y.2d at 475 (parties to a contract may bargain as they see fit even if the consideration exchanged is "grossly unequal or of dubious value"). SCS provided ample consideration for the IUDA: SCS's DAD Technology, SCS's advisory services, and the potential for Commerzbank to take advantage of SCS's connections in the industry. Even if "grossly unequal" when compared to that offered by Commerzbank, this consideration is legally sufficient.

### 4. The IUDA's Fee Provision is Not An Indefinite "Agreement to Agree"

Commerzbank argues that the IUDA's fee provision—Section 6—is an unenforceable "agreement to agree." (Mem. at 18.) This contention is off the mark. The IUDA is not an "agreement to agree." It is not, as Commerzbank urges, an agreement that allows Commerzbank to enter into transactions based on SCS's information, with a price to be determined later. Rather, Section 6 of the IUDA provides that Commerzbank cannot transact—unless, that is, Commerzbank has negotiated a *separate fee agreement* with SCS:

> For the avoidance of doubt, [Commerzbank] cannot use any Confidential Information to proceed with, or participate in, a Transaction unless [Commerzbank] has entered into a Fee Agreement with SCS […]

---

[5]     SCS's agreement with SG—which provides for "the performance of certain consulting and advisory services for [SG] including the introduction of potential clients […]"—supports a finding that SCS was in the business of providing its clients more than the mere disclosure of novel information. (SMF ¶ 263.)

FILED UNDER SEAL—CONFIDENTIAL

(DF ¶ 79.) The IUDA is clear: Commerzbank cannot proceed with, or participate in, "a Transaction," which is defined elsewhere in the IUDA. Entry into a Fee Agreement with SCS is a condition subsequent that extinguishes Commerzbank's obligation not to transact

"[A]t some point virtually every agreement can be said to have a degree of indefiniteness, and a "conclusion that a party's promise should be ignored as meaningless is at best a last resort." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). In this case, it is evident both from the language of the IUDA, as well as the course of conduct surrounding it, that SCS entered into the agreement with the expectation that it would be paid if Commerzbank transacted using SCS's information. There is no reason to conclude that SCS intended to gratuitously disclose information and expend effort advising Commerzbank. Indeed, SG and Commerzbank knew that SCS expected to be paid, and even Commerzbank contemplated paying SCS at some point. (SMF ¶¶ 205–207.)

Even if the Court were to accept Commerzbank's construction of the IUDA, the obligation to enter into a "market-based fee agreement" is not indefinite in this case. Deposition testimony from both SCS's and Commerzbank's witnesses—as well as Commerzbank's expert—is consistent on the usual range for fees in structured finance transactions: 1 to 10%, varying with the overall economic benefit achieved by the transaction. Commerzbank purposely muddies the distinction between the economic benefit to a party, and the notional value—or face value—of a transaction. (SMF ¶ 33.) While a transaction with a large face value can have a small benefit—or *vice versa*—it is undisputed that fees are usually calculated with reference to the economic benefit, even though any particular fee agreement may refer to a percentage of the notional amount.

FILED UNDER SEAL—CONFIDENTIAL

## B. Commerzbank Breached the IUDA

In asking for judgment on SCS's breach claims, Commerzbank misreads the IUDA's plain language—and ignores other portions of the agreement, as well as the ample evidence of breach.

### 1. Commerzbank Breached Section 6 of the IUDA

Commerzbank's contention that it did not breach Section 6 of the IUDA founders on a plain reading of the contract.

The IUDA contains a section entitled "Purpose," which states that the purpose of the IUDA "is to enable [Commerzbank] to evaluable, and potentially execute transactions [...] described by SCS," subject to certain obligations. (DF ¶ 71.) In accordance with the contract's title—"Information Use and Disclosure Agreement"—the IUDA did not merely restrict Commerzbank's ability to disclose SCS's information, but restricted Commerzbank's use of the information, and imposed other obligations on Commerzbank as well.

The most significant of SCS's bargained-for promises was Commerzbank's undertaking that it "enter into a written fee agreement with SCS [...] prior to effecting *any* Transaction for itself or on behalf of an unrelated party," (DF ¶ 79.), not, as Commerzbank urges, the confidentiality and exclusivity obligations, (Mem. at 16.) The IUDA clarified Commerzbank's obligations in this regard: "For the avoidance of doubt, [Commerzbank] cannot use any Confidential Information, *or proceed with, or participate in*, a Transaction unless [Commerzbank] has entered into a Fee Agreement." (DF ¶ 79 (emphasis added).) The IUDA defined "Transaction" as the "transactions [...] described by SCS" to Commerzbank—i.e., the DAD Transaction structure—"together with substantially similar transactions, in whole or in part [...]." (DF ¶ 75.)

It is undisputed that Commerzbank never entered into a fee agreement with SCS. (SMF ¶¶ 211, 212.) The unambiguous language of the IUDA therefore prohibited Commerzbank from

FILED UNDER SEAL—CONFIDENTIAL

proceeding with, or participating in, any transaction structured as a DAD Transaction, or any transaction that is substantially similar in whole or in part. The 2013 and 2014 Transactions are such transactions: they are both substantially similar—if not identical—to SCS's DAD Transaction. (*See* "Factual Background" §§ F and H, above).

A plain reading of the IUDA, and the evidence adduced in discovery, compel the conclusion that Commerzbank breached the IUDA by participating in the 2013 Transaction without negotiating a fee agreement with SCS.

Commerzbank contends that Section 6 of the IUDA should be read in light of Sections 5 and 7 in order to give it "a coherent meaning," namely a meaning that does not impose any obligations on Commerzbank. Setting aside that Section 6 is, as described above, coherent to begin with, Sections 5 and 7 of the agreement do not compel judgment in favor of Commerzbank.

A plain reading of Section 6 does not render Section 5 "superfluous"—the obligation to "work with SCS" is not the same as the obligation not to "proceed with, or participate in, a Transaction." Moreover, Commerzbank distorts the language of Section 5 in service of its argument. Section 5 provides that "During the [effective period], with respect to Transactions involving disclosed SCS Clients, [Commerzbank] will only work with SCS." (DF ¶ 78.) Commerzbank would rewrite the agreement to read: 'Commerzbank will only work with SCS with respect to Transactions involving disclosed SCS Clients.' The difference between these two readings is that, under a plain reading, "Transactions involving disclosed SCS Clients" is a sub-category of "Transactions" with *additional* contractual obligations described in Section 5. By contrast, Commerzbank's reading would modify the definition of "Transaction" used throughout the entire IUDA, to require that the transaction involve a counterparty introduced by SCS. The

FILED UNDER SEAL—CONFIDENTIAL

remainder of Section 5—which provides that Commerzbank may work with others on "transactions unrelated to the Transactions," as long as it does not use SCS's information to do so—definitively contradicts Commerzbank's reading of the IUDA.[6]

Commerzbank argues that Section 7 of the IUDA "carves out" essentially all the information SCS disclosed to Commerzbank. (Mem. at 13.) Setting aside the fact that Section 7 explicitly refers to the "confidentiality obligations" of Section 3, and not the exclusivity and use restrictions of Sections 5 and 6, even if the Court determines that Section 7's confidentiality exceptions must be read together with Section 6, they do not influence the outcome in this case, none of Section 7's three enumerated confidentiality exceptions applies. SCS's information was not "generally available to the public," nor was it "developed independently by the receiving party." The remaining exception, where the information

> was, is or becomes available *lawfully* to the receiving party [...] from a source *other than the disclosing party* [...] which, to the knowledge of the receiving party, is *not subject to a confidentiality obligation to the disclosing party*

(DF ¶ 80, emphasis added). This exception does not apply for the reasons described in Part 1.A.2, above. Indeed, it makes clear that SCS intended to protect itself against the very facts alleged in this case.

As to Commerzbank's contention that Section 6 cannot be read to require payment because "the information was non-confidential," (Mem. at 16), New York courts have enforced agreements to pay for non-confidential information. *See High v. Trade Union Courier Pub. Corp.*, 69 N.Y.S.2d 526, 529 (N.Y. Sup. Ct. 1946) (contract for publicly-available tax treatment information); *see also Keller v. Am. Chain Co.*, 255 N.Y. 94, 97 (1930) (distillation and analysis of "more or less intricate" public rail tariff classifications).

---

[6]   Commerzbank's reading is further undermined by the fact that the IUDA provides only that SCS will introduce counterparties "where appropriate." (DF ¶ 74.)

FILED UNDER SEAL—CONFIDENTIAL

### 2. Commerzbank Breached Section 7 of the IUDA

Commerzbank knowingly breached Section 7 of the IUDA, which required prompt notice to SCS of Commerzbank's intention to assert specific exceptions to the IUDA's confidentiality obligations. The provision states, in relevant part that: "The receiving party *shall promptly notify* the disclosing party if it believes that *any* Confidential Information received is excepted pursuant to this Section 7." (DF ¶ 80.) (emphasis added).

Commerzbank now asserts that it already knew at least some portions of the information SCS disclosed to it. (Mem. at 13–14). Commerzbank knew it had a duty to notify SCS if it believed it had such defenses. (SMF ¶¶ 165, 172.) Despite the IUDA's clear language, and Commerzbank's knowledge of its obligations, Commerzbank never notified SCS that it believed the information SCS disclosed to it was already known to it. (SMF ¶¶ 171–173, 194.)

### 3. Commerzbank Breached Section 3 of the IUDA

Commerzbank focuses on the confidentiality obligations of Section 3 of the IUDA, as modified by Section 7, (Mem. at 12–14), but it ignores Section 3's non-circumvention clause:

> For the avoidance of doubt, receiving party will not use any information, whether confidential or not, to circumvent, bypass or compete with, the disclosing party.

(DF ¶ 76.) There is ample evidence upon which a factfinder could conclude that Commerzbank breached this provision. (SMF ¶¶ 260–262.)

### C. Commerzbank Waived its Right to Dispute the Novelty of the Information

Commerzbank relies heavily on disputing the novelty of the information SCS disclosed in order to assail the validity of the IUDA itself, (Mem. at 17–18), and its scope (*id.* at 12–17). As argued in Part I.A.1, above, the novelty of SCS's disclosure is disputed. If Commerzbank believed SCS's disclosure was not novel, however, it was under a duty to promptly notify SCS. To the extent that Commerzbank now attempts to rely on the novelty defenses enumerated in

FILED UNDER SEAL—CONFIDENTIAL

Section 7 of the IUDA, Commerzbank has waived this right, or, alternatively, is estopped from doing so.

Under New York law, "[w]aiver requires a clear manifestation of an intent by [a party] to relinquish [a] known right." *DLJ Mortgage Capital Corp. v. Fairmont Funding, Ltd.*, 920 N.Y.S.2d 1, 2 (1st Dep't 2011) (internal quotation marks removed). That standard is met in this case. If the confidentiality exceptions in Section 7 of the IUDA provided—as Commerzbank now argues—a right to escape its obligations under the IUDA, Commerzbank was aware of such a right, and discussed internally its obligation to "carve out" any known information from the terms of the agreement, even before it received SCS's disclosure. (SMF ¶ 242.)

This is not a case of "mere silence and inaction" on the part of Commerzbank. *EchoStar Satellite, LLC v. ESPN, Inc.*, 79 A.D.3d 614, 618 (1st Dep't 2010). The IUDA's plain language put Commerzbank under an *affirmative duty* to "promptly notify" SCS of such a belief—a duty Commerzbank understood. Given Commerzbank's sophistication, evidence adduced in discovery showing it understood its disclosure obligations under the IUDA, and the fact that Commerzbank never made a disclosure—that is, until it was sued and took its present litigation position—Commerzbank has intentionally and unmistakably relinquished its ability to now dispute the novelty of SCS's disclosure in order to escape its obligations under the IUDA.

## II. SUMMARY JUDGMENT IS UNWARRANTED ON THE TRADE SECRET CLAIM BECAUSE SCS TOOK SUFFICIENT MEASURES TO MAINTAIN THE SECRECY OF THE DAD TECHNOLOGY

Commerzbank claims "there is no factual dispute as to [whether SCS possessed a trade secret]." (Mem. at 8). Under New York law, however, the determination of whether information is a trade secret is a fact-intensive inquiry involving the consideration of six discrete factors. *N. Atl. Instruments, Inc. v. Haber*, 188 F. 3d 38, 44 (2d Cir. 1999). The evidence put forward by

20

FILED UNDER SEAL—CONFIDENTIAL

Commerzbank does not come close to conclusively establishing that SCS did not possess a trade secret.

### A. SCS Adequately Maintained the Secrecy of its Information

"Secrecy is a question of fact." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986). "The adequacy of the measures taken to protect the secrecy of the product is a fact question." *Julie Research Labs., Inc. v. Select Photographic Eng'g, Inc.*, 810 F.Supp. 513, 520 (S.D.N.Y. 1992).

In *Big Vision*, this Court found that no trade secret existed because the plaintiff had disclosed the information publicly in a patent application, and "to at least 16 separate third parties, without licensing the information, exacting written nondisclosure agreements, or *even asking each one of them to maintain confidentiality*" *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 269 (S.D.N.Y. 2014). These facts were "extreme" enough to allow a determination, as a matter of law, that no trade secret existed, because "no reasonable factfinder could find that [plaintiff] undertook reasonable efforts to maintain the secrecy of its alleged trade secret." *Id.*

The authority cited by Commerzbank is inapposite for the fundamental reason: SCS did not disclose its DAD Technology publicly—as was the case in *Big Vision*—and did not disclose it to the defendant itself without the obligation of confidentiality. *See, e.g.*, *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063–1064 (2d Cir. 1985) (plaintiff inadvertently left trade secret on computer it sold to defendant); *Julie Research Labs.*, 810 F.Supp. at 520 (plaintiff revealed information directly to defendant without confidentiality obligation); *Edelman v. Starwood Capital Grp., LLC*, 892 N.Y.S.2d 37 (1st Dep't 2009) (plaintiff's agent disclosed information to defendant under unenforceable oral assurance).

FILED UNDER SEAL—CONFIDENTIAL

SCS's disclosure of the information to Commerzbank was made pursuant to the confidentiality obligations of the IUDA. (SMF ¶ 243.) The only other source of the DAD Technology alleged in this case—SG—was also under an obligation of confidentiality to SCS. (SMF ¶ 180.) SCS's disclosure of its DAD Technology to a few third parties—under assurances of confidentiality—does not compel the conclusion that SCS did not undertake "reasonable efforts" to maintain the secrecy of the DAD Technology. *Big Vision*, 1 F.Supp.3d at 269.

The record in this case shows that SCS operated at all times as if it had trade secrets to protect, and made substantial efforts to bind its clients with pledges of confidentiality. Deloitte was subject to confidentiality obligations. (SMF ¶ 244.) The information disclosed to AIG was subject to a confidentiality agreement between Deutsche Bank and AIG. (SMF ¶ 245.) Moreover, AIG and SCS formalized their oral confidentiality agreement in a written agreement in 2012. (SMF ¶ 246.)

**B.  SCS's Boilerplate Disclaimers Do Not Destroy Confidentiality.**

The disclaimer, and others like it, are insufficient to compel judgment on the trade secret claim because (1) the disclaimer did not have effect until a DAD Transaction was actually executed; (2) there is a dispute as to what portions of the DAD Technology are covered; and (3) such a finding requires interpreting SCS's agreements to produce an unreasonable result.

Fundamentally, the DAD Technology is not affected by the confidentiality disclaimer because SCS's DAD Technology, standing alone, is not relevant to the tax treatment of any specific transaction. Indeed, as Commerzbank's expert witness has opined—"the SCS Presentation […] really does not describe a specific 'transaction' at all." (SMF ¶ 247.) The DAD Technology includes transaction structuring concepts that, until actually implemented in one or more concrete capital markets transaction, cannot constitute "tax treatment" or "tax structure" under the Treasury Regulations. There is no evidence that *any* transaction employing the DAD

FILED UNDER SEAL—CONFIDENTIAL

Transaction was executed until April 23, 2013, well after Commerzbank would have misappropriated SCS's trade secret—or breached the IUDA—by proceeding with, structuring or arranging both the 2013 and 2014 Transactions. The ability to make a future disclosure contingent on entering into a fee agreement with SCS then executing a transaction does not destroy SCS's trade secret.

At any rate, the determination of which portions of the DAD Technology might constitute "tax treatment" or "tax structure" is a disputed question of fact. SCS also provided Commerzbank information on capital markets structures, financing strategies, risk management, investment alternatives, and regulatory and accounting matters, which Commerzbank considered relevant to the 2014 Transaction. (SMF ¶¶ 204, 205). Such information is not "tax treatment" or "tax structure." (SMF ¶ 248.)

The disclaimers should not be found to conflict with the confidentiality obligations SCS sought to impose on both SG and Commerzbank. In its delivery of the presentation, SCS reiterated that the information was to be treated as confidential information under the IUDA, and the presentation itself stated it was: "provided […] under the terms of the confidentiality undertaking between SCS and Recipient." (SMF ¶¶ 243, 249.)

Finding that boilerplate disclaimers destroyed the secrecy of SCS's information—in spite of substantial evidence of SCS's efforts to maintain it—would entirely frustrate SCS's confidentiality agreements. SCS reasonably believed that those agreements would protect the secrecy of its information, and even Rosansky testified that he believed SG's Confidentiality Agreement with Commerzbank protected "the technology." (SMF ¶¶ 250, 251.) Commerzbank's position requires hollowing out the entirety of the agreements' confidentiality obligations could

FILED UNDER SEAL—CONFIDENTIAL

not have been intended by the parties. *See Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at \*12 (S.D.N.Y. Aug. 10, 2015).

### III.   THE UNJUST ENRICHMENT CLAIM IS VIABLE IN THE ALTERNATIVE.

SCS may maintain its claim for unjust enrichment as there is a "bona fide dispute as to the validity and enforceability of the contract." *Atlas Partners, LLC*, 2015 WL 4940126, at \*12.

Use of the DAD Technology provided economic benefit to Commerzbank. Even if the transaction was approved beforehand, SCS's information may have allowed Commerzbank to adjust the final pricing of the transaction. (SMF ¶¶ 252, 253) Even if Commerzbank has not yet monetized the tax losses it rescued from HF NY as a result of the 2014 Transaction rescuing those losses was—and remains—intrinsically valuable. (SMF ¶ 220.) Commerzbank's own internal approvals value the losses at $70 million (SMF ¶ 254).

### IV.   SUMMARY JUDGMENT IS UNWARRANTED ON THE FRAUD CLAIM; THERE IS SUFFICIENT EVIDENCE OF RELIANCE AND INTENT.

Commerzbank contends, (Mem. at 22–25), that the fraud claim fails as a matter of law, because SCS cannot show reliance or intent to defraud with respect to Burrows's statement that the size of the 2013 Transaction was $150 million. There is, however, significant evidence on the basis of which a factfinder could find in SCS's favor on these elements.

#### A.  SCS Reasonably Relied on Commerzbank's Misrepresentation

SCS explicitly began negotiations with SG upon being told this information and relied on its accuracy in framing those claims and in the final settlement with SG. (SMF ¶¶ 225, 226.) Had it known the 2013 Transaction was $1.3 billion it would have sought a substantially larger amount from SG. (SMF ¶¶ 225, 226.) Commerzbank's own expert has opined that the notional value of a trade is a significant figure in calculating a fee. (SMF ¶ 255.) Because SG undertook the 2013 Transaction to create a regulatory, rather than a tax benefit, the notional value is the

FILED UNDER SEAL—CONFIDENTIAL

most important metric. Indeed, the industry practice is to describe transactions in terms of their notional size, not any other measure, such as credit exposure. (SMF ¶¶ 224, 234.)

The $150 million figure does not match any other metric related to the 2013 Transaction. The credit exposure taken by Commerzbank for the 2013 Transaction was not $150 million, but was, in fact $120 million. (DF ¶ 72.) The $150 million figure was never corrected by Commerzbank, even though SCS brought it to Commerzbank's attention. (SMF ¶ 109.)

### B. There is Sufficient Evidence Commerzbank Intended to Mislead SCS.

Commerzbank stood to benefit from its misrepresentation by cementing its relationship with SG. Commerzbank and SG were counterparties to the 2013 Transaction, and Commerzbank sought to transact again in the 2014 Transaction. Burrows himself was aware that SG had obtained the DAD Technology from SCS, (SMF ¶ 194), and there is other evidence of undocumented coordination between SG and Commerzbank with respect to paying SCS, (SMF ¶ 207). Commerzbank also stood to benefit from underplaying the size of the 2013 Transaction, as SCS's fee demands against Commerzbank would be based on SCS's knowledge of the transaction's size or notional value.

### CONCLUSION

For the foregoing reasons Plaintiff respectfully requests that the Court deny defendant's motion for summary judgment in its entirety.

FILED UNDER SEAL—CONFIDENTIAL

September 21, 2015                    Respectfully submitted,
Washington, D.C.


                                     ZERBE, FINGERET, FRANK & JADAV, P.C.


                                     By:  _____
                                          Felipe Bohnet-Gomez
                                          Jefferson Read
                                     1455 Pennsylvania Ave., N.W., Suite 300
                                     Washington, DC 20004
                                     (202) 888-7006
                                     fbgomez@zffjlaw.com


                                     *Attorneys for Plaintiff Structured Capital Solutions, LLC*