FILED UNDER SEAL—CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STRUCTURED CAPITAL SOLUTIONS, LLC<br><br>Plaintiff,<br><br>v.<br><br>COMMERZBANK, AG, NEW YORK BRANCH<br><br>Defendant. | Civil Action No.:<br><br>1:15-cv-00905 (JSR) (JLC)<br><br><br>**Plaintiff's Local Rule 56.1 Statement of Material Facts** |

Plaintiff Structured Capital Solutions, LLC ("SCS") submits the following Statement of Material Facts pursuant to Local Rule 56.1 of the Southern and Eastern Districts of New York, in opposition to Defendant Commerzbank, AG, New York Branch's ("Commerzbank") Motion for Summary Judgment:

1–12.   Admit solely for the purpose of the instant motion.

13.     At all stages during discussions with AIG, AIG represented they would keep SCS's information confidential and enter into an NDA with SCS if they were going to proceed, and when AIG decided to proceed it subsequently entered such an agreement in 2012. Read Decl. Ex. 32 (Edwards Decl. ¶ 22). Tony Tuths represented to Mark McTigue that AIG and Deutsche Bank were operating under a broad NDA. (Read Decl. Ex. 35 (McTigue Dep. 69:13-24). Further, presentation by Deutsche was marked as "strictly private and confidential"  Irwin Decl. Ex. 27.

14.     Admit solely for the purpose of the instant motion.

FILED UNDER SEAL—CONFIDENTIAL

15.    At all stages during discussions with AIG, AIG represented they would enter into an NDA with SCS if they were going to proceed, and when AIG decided to proceed it subsequently entered such an agreement in 2012. Read Decl. Ex. 32 (Edwards Decl. ¶ 22);. Tony Tuths represented to Mark McTigue that AIG and Deutsche Bank were operating under a broad NDA. Read Decl. Ex. 35 (McTigue Dep. 69:13-24).

16.    Admit solely for the purpose of the instant motion.

17.    Admit solely for the purpose of the instant motion.

18.    Admit solely for the purpose of the instant motion.

19.    Admit solely for the purpose of the instant motion.

20.    SCS objects to the statement of fact because it does not include the full text of the agreement. Subjection to the objection, SCS admits solely for the purpose of the instant motion.

21.    Admit solely for the purpose of the instant motion.

22.    Admit solely for the purpose of the instant motion.

23.    Admit solely for the purpose of the instant motion.

24.    SCS objects to the statement of fact because it does not include the full text of the agreement. Subjection to the objection, SCS admits solely for the purpose of the instant motion. .

25.    The IUDA between Deutsche Bank London Branch and SCS includes not one but multiple fee clauses which include:

       a.  a fee of 0.9% of the aggregate initial face value of the deferred asset exchange components of the transaction, "or such other amount as the parties may at the time [] agree," to be paid by

2

FILED UNDER SEAL—CONFIDENTIAL

Deutsche Bank London Branch if the transaction was completed "with SCS's active involvement." (Irwin Decl. Ex. 3 at ¶ 2(b) (Information Use and Transaction Proposal Agreement)).

b. A fee of 2.25% of the aggregate initial face value of the deferred asset exchange components of the transaction, if Deutsche Bank or its affiliates completes a "Potential Transaction" without SCS's active involvement. (Irwin Decl. Ex. 3 at ¶2(a) (Information Use and Transaction Proposal Agreement)).

c. An additional 50/50% split between Deutsche Bank and SCS of 2% of the aggregate initial face value of the deferred asset exchange components and .1% of the aggregate initial face value of the transaction to be charged a third-party participant to the transaction. (Irwin Decl. Ex. 3 at ¶2(c) (Information Use and Transaction Proposal Agreement.))

26.     Admit solely for the purpose of the instant motion.

27.     Admit solely for the purpose of the instant motion.

28.     Admit solely for the purpose of the instant motion.

29.     Admit solely for the purpose of the instant motion.

30.     Admit solely for the purpose of the instant motion.

31.     Paul Edwards, as SCS corporate representative testified that the benchmark is 10 percent and that it could be lower than when you are dealing with superscale transactions ie. 5 billion to 15 billion you are probably not going to get 10 percent benefit. Irwin

3

FILED UNDER SEAL—CONFIDENTIAL

Decl. Ex. 1 268:4-12, 268:21 – 269:4 (SCS 30(b)(6) Dep.); *see also* Read Decl. Ex. 33 (Parr Decl.) ¶ 11.)

32.    Admit solely for the purpose of the instant motion.

33.    Plaintiff objects to the statement of fact because it is an incomplete statement of Mr. Parr's testimony. Parr testified that if someone entered into the transaction that the fee could range between 2 to 5 percent "of the face value of the assets acquired under the transaction". (Irwin Decl. Ex. 25 at 175:19-176:7 (Parr Dep.); Read Decl. Ex. 33, ¶11 (Parr Decl).

34–45. Admit solely for the purpose of the instant motion.

45.    Admit solely for the purpose of the instant motion.

46.    Admit solely for the purpose of the instant motion.

47.    Admit a meeting occurred where the DAD may have been discussed. However, contrary to Mr. Aiken's declaration, Mr. Aiken testified under oath in deposition that he wasn't involved in and wasn't familiar with the details of the 2013 and 2014 Transactions. (Read Decl. Ex. 9 124:9-25 (Aiken Dep.).

48.    SCS admits that a meeting occurred where the DAD may have been discussed. However, contrary to Mr. Aiken's declaration, Mr. Aiken testified under oath in deposition that he wasn't involved in and wasn't familiar with the details of the 2013 and 2014 Transactions. (Read Decl. Ex. 9 124:9-25 (Aiken Dep.).)

49.    Admit solely for the purpose of the instant motion.

50.    Admit solely for the purpose of the instant motion.

51.    Admit solely for the purpose of the instant motion.

52.    Admit solely for the purpose of the instant motion.

FILED UNDER SEAL—CONFIDENTIAL

53.    Admit solely for the purpose of the instant motion.

54–56. Admit solely for the purpose of the instant motion.

57.    Admit solely for the purpose of the instant motion.

58.    Admit solely for the purpose of the instant motion.

59.    Prior to the 2013 Transaction, Commerzbank had never seen or executed a DAD Transaction with the same three steps in the same sequence and order as presented by SCS. Read Decl. Ex. 6, (Sopkin Dep.) 121:16–122:10, 160:10–161:23; Read Decl. Ex. 4, (Rosansky Dep.) 41:7-11; Read Decl. Ex. 5, (Kozak Dep.) 22:5–19, 79:10-24; Read Decl. Ex. 8, (Burrows 30(b)(1) Dep.) 36:4-8. Contrary to his declaration, Leon Kozak testified in Deposition that he had not seen the same order and sequence of the DAD transaction before April 25, 2013 and that he had only one phone call involving the 2013 Transaction and that on the phone call only barter and identified mixed straddle were discussed generally. Read Decl. Ex. 5, (Kozak Dep.) 22:5–19, 79:10-24, 45:14–49:19. Documents produced by Commerzbank further show that as of December 19, 2012 Commerzbank did not fully understand the DAD transaction and applications as Commerzbank did not believe it would benefit Commerzbank in the role as a principal party. Read Decl. Ex. 26 (Dec. 19 email).

60.    Documents produced by Commerzbank further show that as of December 19, 2012 Commerzbank did not fully understand the DAD transaction and applications as Commerzbank did not believe it would benefit Commerzbank in the role as a principal party. Read Decl. Ex. 26 (Dec. 19 email).

61.    Admit solely for the purpose of the instant motion.

62.    Admit solely for the purpose of the instant motion.

63.    Admit solely for the purpose of the instant motion.

FILED UNDER SEAL—CONFIDENTIAL

64.     Admit solely for the purpose of the instant motion.

65.     Admit solely for the purpose of the instant motion.

66.     Admit solely for the purpose of the instant motion.

67.     On Day 1 of the 2013 Transaction, Commerzbank also accepted an obligation to deliver suitable property at a future fixed date. Read Decl. Ex. 2 (Donohue 30(b)(6) Dep.) 41:24–43:21, 44:16–45:11, 47:24–49:14, 50:2-13; Read Decl. Ex. 4 (Rosansky Dep.) 69:13-21, 161:13–167:6; Read Decl. Ex. 6 (Sopkin Dep.) 53:5–59:10, 160:10–161:23, 170:25–172:11.

68.     Admit solely for the purpose of the instant motion.

69.     Admit solely for the purpose of the instant motion.

70.     Admit solely for the purpose of the instant motion.

71.     Admit solely for the purpose of the instant motion.

72–93.  Admit solely for the purpose of the instant motion.

94.     Larry Rosansky, on behalf of SG, signed a Non-Disclosure agreement with SCS and required Commerzbank sign an NDA. Read Decl. Ex. 24 (NDA between SCS and SG); *see also* Read Decl. Ex. 25 (NDA between Commerzbank and SG). Mr. Rosansky expected the NDA with Commerzbank to apply to the mechanics of the DAD technology and that before Commerzbank would to proceed with or enter into a Transaction, Commerzbank would have to enter into a fee agreement. Read Decl. Ex. 4 221:18 – 223:14 (Rosansky Dep.).

95.     Larry Rosansky expected the NDA with Commerzbank to apply to the mechanics of the DAD technology and that before Commerzbank would to proceed with or enter into a Transaction, Commerzbank would have to enter into a fee agreement. Read Decl. Ex. 4 221:18 – 223:14 (Rosansky Dep.).

FILED UNDER SEAL—CONFIDENTIAL

96.    SCS objects to this statement as it is not a proper statement of fact. It is inappropriate to support a motion for summary judgment by disguising unsworn statements and opinions of Defendant's retained expert as undisputed fact. Tuths's expert report consists of unsworn statements and opinions.

97.    SCS objects to this statement as it is not the proper basis for a statement of fact or basis of factual support for a motion for summary judgment as it attempts to rely on expert opinion. Subject to and without waiving the objection, the IUDA agreement entered into between SCS and Commerzbank included industry standard confidentiality disclaimer language solely with respect to the tax treatment and tax structure of the transaction as defined under U.S. Treasury Regulation 1.6011-4(c)(8) and (9). Attached as Exhibit 1 to Marc Fuhrman's Declaration is the DAD presentation that SCS delivered to Commerzbank and which is color coded in red to indicate those elements which constitute "tax treatment" and "tax structure" as defined by US Treasury Regulation 1.6011-4(c)(8) and (9) when a transaction is entered into and those sections and elements which are not so defined and therefore confidential in green.  Read Decl. Ex. 34 (Fuhrman Decl. and exhibit) As the section of the presentation on the Contingent Payment Debt Obligation transaction is not relevant to the current litigation, it has been ignored. Ex.34 (Fuhrman Decl.) ¶13-14. The mere recital of tax provisions in a presentation or otherwise is not defined under U.S. Treasury Regulation 1.6011-4(c)(8) and (9) as an item or statement of "tax treatment" or "tax structure." Read Decl. Ex.34 (Fuhrman Decl.) ¶13-14.

98.    Prior to the 2013 Transaction, Commerzbank had never seen or executed a Deferred Asset Delivery Transaction with the same three steps in the same sequence and order as presented by SCS. Read Decl. Ex. 6 (Sopkin Dep.) 121:16–122:10, 160:10–161:23; Read. Decl. Ex. 4 (Rosansky Dep.) 41:7-11; Read Decl. Ex. 5 (Kozak Dep.) 22:5–19, 79:10-24; Read Decl.

FILED UNDER SEAL—CONFIDENTIAL

Ex. 8 (Burrows 30(b)(1) Dep.) 36:4-8.). Commerzbank knew it had a duty to promptly disclose to SCS if Commerzbank believed it had a defense listed under paragraph 7 of the IUDA, but did not disclose it believed it had a defense to SCS. (Read Decl. Ex. 2, Donohue 30(b)(6) Dep. 189:16–190:9.). Commerzbank never notified SCS that Commerzbank considered the DAD transaction technology provided in the SCS presentation to be excepted from protection under section 7 of the IUDA. Read Decl. Ex. 2 (Donohue 30(b)(6) Dep.) 38:25–39:15 Read Decl. Ex. 5 (Kozak Dep.) 19:19–20:25.

99.     Prior to the 2013 Transaction, Commerzbank had never seen or executed a DAD Transaction with the same three steps in the same sequence and order as presented by SCS. Read Decl. Ex. 6 (Sopkin Dep.) 121:16–122:10, 160:10–161:23; Read Decl. Ex. 4 (Rosansky Dep.) 41:7-11; Read Decl. Ex. 5 (Kozak Dep.) 22:5–19, 79:10-24; Read Decl. Ex. 8 (Burrows 30(b)(1) Dep.) 36:4-8. Documents produced by Commerzbank further show that as of December 19, 2012 Commerzbank did not fully understand the DAD transaction and applications as Commerzbank did not believe it would benefit Commerzbank in the role as a principal party. Read Decl. Ex. 26 (Dec. 19 email).

100.    Admit solely for the purpose of the instant motion. .

101.    As of December 19, 2012, Commerzbank did not fully understand the DAD transaction and applications as Commerzbank did not believe it would benefit Commerzbank in the role as a principal party. Read Decl. Ex. 26 (Dec. 19 email).

102–104.      Admit solely for the purpose of the instant motion. .

105.    As an experienced banking professional, Paul Burrows would or should have known that other banking professionals would have understood Paul Burrows to be

FILED UNDER SEAL—CONFIDENTIAL

referring to $150,000,000 as the notional face value of the transaction. Read Decl. Ex. 33 ¶ 22 (Parr. Decl.).

106.    Admit solely for the purpose of the instant motion.  .

107.    Admit solely for the purpose of the instant motion.  .

108.    Adam Parr and Paul Edwards met with Paul Burrows of Commerzbank in their London offices on 25 April 2013 and it was clear from the questions and answers Burrows knew SCS was discussing gross size as the only metric relevant to benefit and how fees are calculated. Read Decl. Ex. 33 ¶ 22 (Parr. Decl.); *see also* Read Decl. Ex. 32 ¶ 44-46 (Edwards Decl.).

109.    The citation to the SCS 30(b)(6) witness testimony actually states that Commerzbank, not SCS, never reconfirmed the 150 million number after the April 25, 2013 conversation with Paul Burrows. (Irwin Decl. Ex. 20 544:9-18.) Mr. Edwards goes on to state that Commerzbank also never corrected the number when the amount became a topic of other conversations. (*Id.*)

110.    Admit solely for the purpose of the instant motion.

111.    Admit solely for the purpose of the instant motion.

112.    Admit solely for the purpose of the instant motion.

113.    Admit solely for the purpose of the instant motion.

114.    Admit solely for the purpose of the instant motion.

115.    Admit solely for the purpose of the instant motion.

116–130.       Admit solely for the purpose of the instant motion.

131.    Commerzbank's purpose for the 2014 Transaction was to preserve net operating losses it had in HF NY.  For approximately seven or eight years prior to the 2014

9

FILED UNDER SEAL—CONFIDENTIAL

Transaction Commerzbank's Structured Capital Markets group had attempted to devise a transaction structure that would enable Commerzbank to move losses from HF NY to another entity. Burrows 30(b)(1) Dep. 19:9-16.  The banks' restructuring efforts relating to HF, and the wind-down of HF NY, were referred to internally as "Project Red Apple." Sopkin Dep. 114:10–115:9.  As part of the 2014 Transaction, Commerzbank moved at least 140 million in net operating losses into an affiliate company, Eschborn, which was formed as a special purpose vehicle for the 2014 Transaction. Donohue 30(b)(6) Dep. 117:20-23; Donohue 30(b)(6) Dep. 118:13-23.  The execution of the 2014 Transaction allowed Commerzbank to preserve net operating losses it had in its Eurohypo New York branch which would have otherwise been lost when it was closed. Donohue 30(b)(6) Dep. 118:13-23; Kozak Dep. 60:7–61:8.  The preservation of net operating losses has a value to Commerzbank. Sopkin Dep. 160:10–161:23.  In June 2014, within a few months after the Eschborn entity had been capitalized, the value of Eschborn was reduced from $215 million to around 10.9 million. Read Decl. Ex. 23; Kozak Dep. 115:17–117:8, 118:14-25.  Prior to June 2014, with over $215 million in assets, Commerzbank had sufficient assets in Eschorn to utilize the $140 million in losses, but instead stripped out the assets from Eschborn. Read Decl. Ex. 23; Kozak Dep. 115:17–117:8, 118:14-25.

132.    Admit solely for the purpose of the instant motion.

133.    Admit solely for the purpose of the instant motion.

134.    Admit solely for the purpose of the instant motion.

135.    SCS objects to the statement because it is not a statement of fact, but opinion and because the "this" term used in the statement does not state which aspect had the purported effect. Subject to and without waiving the objection, SCS admits solely for the purpose of the instant motion that Commerzbank was able to preserve at least $140 million in losses.

10

FILED UNDER SEAL—CONFIDENTIAL

136.    Admit solely for the purpose of the instant motion.

137.    Admit solely for the purpose of the instant motion.

138.    Admit solely for the purpose of the instant motion.

139.    Commerzbank was able to preserve 140 million to 200 million in net operating losses that would have been otherwise lost. Read Decl. Ex 3 (Donohue 30(b)(6) Dep. 117:20-23, 118:13-23. The ability to preserve losses has a value which is a benefit to Commerzbank. Read Decl. Ex. 7 (Sopkin Dep.) 160:10–161:23; Read Decl. Ex 3 (Donohue 30(b)(6) Dep. 118:13-23; Read Decl. Ex 6 (Kozak Dep. 60:7–61:8.). Commerzbank also had sufficient assets in Eschborn to utilize losses, but stripped the assets out of Eschborn in June of 2014. Read Decl. Ex. 6 (Kozak Dep. 115:17–117:8, 118:14-25. Commerzbank continues to have more than sufficient assets to monetize the net operating losses in Eschborn, but to date has chosen not to do so. Read Decl. Ex. 3, (Donohue 30(b)(6) Dep.) 118:24–119:5.


**Plaintiff submits the following additional material facts as to which it is contended that there exists a genuine issue to be tried:**


140.    SCS is a structured finance advisory and arranging boutique operating in the U.S., U.K., and in Europe. Read. Decl. Ex 29 (Parr Dep.) 26:22–24.

141.    Commerzbank is a branch of Commerzbank AG, which is a banking and financial services company based in Frankfurt, Germany. MTD Mem. at 1, ECF No. 8.

142.    On or about October 16, 2012, an introductory meeting was held between Commerzbank and SCS at Commerzbank's London offices. Am. Ans. ¶ 31.

11

FILED UNDER SEAL—CONFIDENTIAL

143.    SCS and Commerzbank's Structured Capital Markets New York group met on November 9, 2012 for an initial pitch meeting, where SCS marketed its advisory services, and its DAD transaction structure information and ideas to Commerzbank. (Read Decl. 30 (Edwards Dep.) 56:13-25, 35:15-36:6, 43:23-44:6.).   SCS provided general information on the DAD transaction technology. *Id.*

144.    During the Nov. 9, 2012, Commerzbank expressed its intent to obtain SCS's services and DAD transaction information and ideas, and the parties began to negotiate a written agreement. Am. Ans. ¶¶ 39-40.

145.    SCS also disclosed to Commerzbank, prior to the execution of the IUDA that SCS had been advising and working with Laurence Rosansky at Société Générale. Read Decl. 20 (Edwards Dep.) 217:11-22.; Read. Decl. Ex. 32 ¶11 (Edwards Decl.).

146.    Following the parties' November 9, 2012 meeting, initial drafts were exchanged. Am. Ans. ¶ 40.

147.    An early draft of the IUDA referred to the SCS's transaction structures by their acronyms—"DAST" and "CPDI" . Read Decl. Ex. 27 (November 29, 2012 email and attachment).

148.    In 2012 Commerzbank's Global Capital Markets Group was concerned that yet another year would end without Commerzbank's Structured Capital Markets group in New York closing a transaction. Read Decl. Ex. 10; Aiken Dep. 201:16–205:10.

149.    In management's assessment, the New York group was underperforming. Read Decl. Ex. 10; Aiken Dep. 201:16–205:10.

FILED UNDER SEAL—CONFIDENTIAL

150.    Commerzbank and SCS executed an Information Use and Disclosure Agreement ("IUDA") on or about January 16, 2013. Read Decl. Ex. 1; Donohue 30(b)(6) Dep. 32:4–22:22; Sopkin Dep. 162:9–163:9; Sopkin Dep. 167:4-7.

151.    Nicholas Sopkin was the Managing Director of the Commerzbank Structured Capital Markets team in New York and had authority to sign on behalf of Commerzbank. Burrows 30(b)(6) Dep. 30:15–31:3; Sopkin Dep. 23:7-12, 167:7-15.

152.    Prior to its execution, Commerzbank presented the IUDA to its internal legal counsel for review and approval. Donohue 30(b)(6) Dep. 33:23–34:9; Burrows 30(b)(6) Dep. 30:15–31:3; Sopkin Dep. 176:4-13.

153.    SCS presented its DAD transaction technology to Commerzbank after the execution of the Information Use and Disclosure Agreement. Donohue 30(b)(6) Dep. 28:21–29:17; Am. Ans. 77, 68.

154.    During these meetings, Commerzbank took advantage of the opportunity to ask questions regarding SCS's transaction structuring information and ideas. Donohue 30(b)(6) Dep. 59:12-13.

155.    SCS additionally set up an introductory meeting between Commerzbank and Swiss Re. Burrows Dep. 102:19-23.

156.    The three-step order and sequence and integration of the steps of the DAD transaction technology were discussed with Commerzbank at SCS's presentation. Donohue 30(b)(6) 30:2–32:2; Sopkin Dep. 32:10–35:8; Sopkin Dep. 205:12–207:7.

157.    The SCS presentation also included post delivery options which included discussion on moving attributes to an affiliate. Sopkin Dep. 42:3-16.

13

FILED UNDER SEAL—CONFIDENTIAL

158.    The DAD transaction technology presented by SCS could be used for various purposes or motives including Basel III, DTA clarification or refreshing or moving losses. Rosansky Dep. 167:25–168:15.

159.    The purpose of the IUDA was so that Commerzbank could evaluate whether it could potentially execute transactions that were substantially similar, in whole or in part, to what SCS would present to Commerzbank. Donohue 30(b)(6) Dep. 35:3-16; Sopkin Dep. 166:7-15.

160.    Under the IUDA, Commerzbank agreed that it would undertake to enter into a fee agreement with SCS prior to its effecting any "Transaction" for itself or on behalf of an unrelated party. Read Decl. Ex. 1, ¶ 6.

161.    As consideration for the contract, SCS undertook to (1) advise and engage in discussions with Commerzbank with respect to Commerzbank's evaluation of potential transactions, (2) provide Commerzbank with confidential transaction structuring information or ideas, and (3) introduce counterparties to Commerzbank "where appropriate." Read Decl. Ex. 1 at 1.

162.    Commerzbank agreed under the IUDA that it could not use any Confidential Information, or proceed with, or participate in, a Transaction unless Commerzbank had entered into a Fee Agreement with SCS. Read Decl. Ex. 1 ¶ 6.

163.    The fee was to be negotiated in good faith prior to the execution of a "Transaction", as defined in the IUDA. Read Decl. Ex. 1 ¶ 6.

164.    Commerzbank understood when it signed the IUDA that it was committing not to use any information provided by SCS to circumvent or compete with SCS. Donohue 30(b)(6) Dep. 38:3-7.

14

FILED UNDER SEAL—CONFIDENTIAL

165.    Under section 7 of the IUDA, Commerzbank was required to promptly notify SCS if it believed that any Confidential Information received is excepted under the IUDA. Read Decl. Ex. 1 ¶ 7; Donohue 30(b)(6) Dep. 133:25–136:15.

166.    SCS complied with the IUDA and made its presentation to Commerzbank which included the DAD transaction technology. Kozak Dep. 30:10–19.

167.    SCS had additional meetings with Commerzbank to advise Commerzbank on the DAD transaction structure. Edwards Dep. 37:17-38:5.

168.    In paragraph 12 of the IUDA Commerzbank agreed that it would act promptly, in good faith and in a commercially reasonable manner at all times and all dealings related to the IUDA. Read Decl. Ex. 1 ¶ 12.

169.    Commerzbank understood when it signed the IUDA that it was committing to only use the confidential information it received solely in connection with the purpose of the IUDA. Donohue 30(b)(6) Dep. 40:17–41:9.

170.    In paragraph 3 of the IUDA, Commerzbank agreed that it would not use any information, whether confidential or not, to circumvent, bypass or compete with SCS. Read Decl. Ex. 1 ¶ 3.

171.    Commerzbank never notified SCS that the DAD transaction technology provided by SCS was not considered by Commerzbank to be confidential. Donohue 30(b)(6) Dep. 39:16–40:16; Kozak Dep. 19:19–20:25.

172.    Commerzbank knew it had a duty to promptly disclose to SCS if Commerzbank believed it had a defense listed under paragraph 7 of the IUDA, but did not disclose it believed it had a defense to SCS. Donohue 30(b)(6) Dep. 189:16–190:9.

FILED UNDER SEAL—CONFIDENTIAL

173.   Commerzbank never notified SCS that Commerzbank considered the DAD transaction technology provided in the SCS presentation to be excepted from protection under section 7 of the IUDA. Donohue 30(b)(6) Dep. 38:25–39:15 Kozak Dep. 19:19–20:25.

174.   The SCS DAD technology presented to Commerzbank included three steps to be conducted in the following order and sequence:

   a.   Step 1: A barter exchange type transaction was to occur between two parties with one party (the principal party) purchasing securities in consideration for the immediate partial payment of cash and the acceptance of an obligation to deliver suitable property at a fixed future date;

   b.   Step 2: The principal party would trigger a taxable gain by doing a mark to market or identified mixed straddle ("IMS"); and

   c.   Step 3: The suitable property would then be finally delivered as agreed.
   Rosansky Dep. 161:13–167:6; Sopkin Dep. 32:10–35:8, 37:8–40:19; Sopkin Dep. 205:12–207:7.

175.   Step 1 of the 3 step sequence would create a low tax basis below fair market value. Rosansky Dep. 161:13–167:6 Sopkin Dep. 32:10–35:8, 37:8–40:19.

176.   Step 2 of the 3 step sequence would trigger a taxable gain. Rosansky Dep. 161:13–167:6 Sopkin Dep. 32:10–35:8, 37:8–40:19.

177.   Step 3 would result in a stepped-up or excess tax basis above the fair market value of the purchased securities. Rosansky Dep. 161:13–167:6 Sopkin Dep. 32:10–35:8, 37:8–40:19.

178.   Larry Rosansky was the managing director of Société Générale and was the primary contact for Commerzbank on the 2013 Transaction. Rosansky Dep. 11:6–12:13.

FILED UNDER SEAL—CONFIDENTIAL

179.    SCS approached Société Générale with a proposal to work together using SCS's DAD transaction structure and information. Rosansky Dep. 16:15–18:14.

180.    After SCS and Société Générale entered into a non-disclosure agreement on May 15, 2011, SCS presented DAD transaction structure information and ideas to Société Générale and advised Société Générale regarding the information. Read Decl. Ex. 24, May 15, 2011 Confidentiality Agr; Rosansky Dep. 31:20–32:3.

181.    Larry Rosansky is familiar with SCS's DAD transaction technology and was part of Société Générale's decision to approach Commerzbank about utilizing SCS's Deferred Asset Delivery transaction technology for the 2013 Transaction with Commerzbank. Rosansky 54:13–55:14.

182.    In late 2012, Société Générale approached Commerzbank in order to gauge Commerzbank's interest in serving as an accommodation party for a Société Générale transaction. Rosansky Dep. 32:16-33:10, 34:3-24.

183.    On September 5, 2012, Société Générale entered into a non-disclosure agreement with Commerzbank. Read Decl. Ex. 25.

184.    On November 8, 2012, Commerzbank's Structured Capital Markets team met with Société Générale to discuss Commerzbank's role as an accommodation party in the 2013 Transaction. Read Decl. Ex. 30.

185.    On November 9, 2012, Commerzbank met with SCS to receive SCS's pitch regarding SCS's transaction structuring information and ideas, and to discuss what would become the IUDA. Read Decl. Ex. 31.

186.    As late as December 19, 2012, Commerzbank did not fully understand the DAD transaction structure, and based on their incomplete understanding, did not think the

17

FILED UNDER SEAL—CONFIDENTIAL

transaction structure would work for Commerzbank as a principal. Read Decl. Ex.26; Aiken Dep. 73:13-19.

      187.   Commerzbank executed a transaction ("the 2013 Transaction") with Société Générale on or about April 23, 2013. Sopkin Dep. 66:9-12.

      188.   Larry Rosansky also worked on the 2014 Transaction with Commerzbank and is familiar with DAD components used in the 2014 Transaction. Rosansky Dep. 197:21-25.

      189.   Prior to the 2013 Transaction, Commerzbank had never seen or executed a DAD Transaction with the same three steps in the same sequence and order as presented by SCS. Sopkin Dep. 121:16–122:10, 160:10–161:23; Rosansky Dep. 41:7-11; Kozak Dep. 22:5–19, 79:10-24; Burrows 30(b)(1) Dep. 36:4-8.

      190.   On or about May 4, 2013, Commerzbank informed Larry Rosansky that for the 2014 Transaction, Commerzbank had taken SCS's idea and added to it. Read Decl. Ex. 13.

      191.   As late as May 8, 2013, Commerzbank was trying to determine whether the SCS DAD transaction technology was being discussed by others in the industry. Read Decl. Ex. 18; Sopkin Dep. 207:7–210:18.

      192.   The 2013 Transaction included all three steps in the same order and sequence as the SCS presentation to Commerzbank. Donohue 30(b)(6) Dep. 41:24–43:21, 44:16–45:11; 47:24–49:14, 50:2-13; Rosansky Dep. 69:13-21, 161:13–167:6; Sopkin Dep. 53:5–59:10, 160:10–161:23, 170:25–172:11.

      193.   Société Générale obtained the DAD technology used in the 2013 Transaction from SCS. Rosansky Dep. 69:13-21.

FILED UNDER SEAL—CONFIDENTIAL

194.    Commerzbank knew the 2013 Transaction technology came from SCS. Read Decl. Ex.11; Read Decl. Ex. 12; Burrows 30(b)(1) Dep. 37:5–38:24.

195.    SCS's DAD transaction technology was novel to Société Générale. Rosansky Dep. 116:15–117:7, 37:14–39:25.

196.    Prior to SCS's presentation, Société Générale had not seen the DAD transaction technology. Rosansky Dep. 41:4-20.

197.    Société Générale understood that the DAD transaction technology was novel to Commerzbank based on the interest displayed and questions asked by Commerzbank's representatives. Rosansky Dep. 116:15–117:7.

198.    Without the DAD transaction technology the 2013 Transaction would not have accomplished the objectives. Rosansky Dep. 112:2–114:2, 167:25–169:6, 197:3-9; Sopkin Dep. 59:11–60:17.

199.    On or about February 11, 2014 Commerzbank executed a second set of transactions ("the 2014 Transaction") with Société Générale. Donohue Dep. 167:6-13.

200.    The 2014 Transaction contemplated and executed between Commerzbank and Société Générale involved Commerzbank and Société Générale switching roles with Commerzbank moving to the role of the principal party and Société Générale acting as an accommodation party for Commerzbank. Sopkin Dep. 74:25–75:11.

201.    Commerzbank's Global head of Structured Finance Business, Neal Aiken sent correspondence to Larry Rosansky at Société Générale indicating after the completion of the 2013 Transaction that Commerzbank had interest in working with Société Générale on Commerzbank's "version of the structure." Read Decl. Ex. 20; Aiken Dep. 15:7–16:24, 118:4–119:4, 122:3–125:21.

FILED UNDER SEAL—CONFIDENTIAL

202.    Commerzbank used the 3 step sequence presented in the SCS presentation in the 2014 Transaction. Donohue 30(b)(6) Dep. 162:6–163:10, 51:2-11, 52:5–53:25, 55:20–56:2; Rosansky Dep. 141:14–142:11, 161:13–167:6; Sopkin Dep. 82:11–89:13, 160:10–161:23, 170:25–172:11; Kozak Dep. 66:6–67:24, 71:25–73:6.

203.    Commerzbank considered using 3 year treasuries in the 2014 Transaction and were advised by their counsel Covington & Burling that the bond may be lengthened to 3 years but chose to use 1.5 year treasuries. Kozak Dep. 111:4–113:12, 114:12–115:14.

204.    Members of Commerzbank's Structured Capital Markets team drafted Tactics Approval Forms to discuss the general steps, remuneration and expenditures expected in the 2014 Transaction. Sopkin Dep. 137:13-15.

205.    Drafts of Commerzbank's internal Tactics Approval Forms for the 2014 Transaction dated March 6, 2013, March 8, 2013, and May 23, 2013 reflect that Commerzbank's Structured Capital Markets team in New York estimated one million dollars in fees would be paid to SCS "with whom Commerzbank had an NDA in place regarding certain aspects of the Transaction." Read Decl. Ex. 14; Read Decl. Ex. 15; Read Decl. Ex. 16; Donohue 30(b)(6) Dep. 81:11–82:4; 82:15–83:5, 101:6–102:23, 111:10–114:18; Sopkin Dep. 132:17–136:25, 141:11–144:18, 145:7–147:21.

206.    Commerzbank understood there was a probability it would have to pay SCS to execute the 2014 Transaction. Donohue Dep. 159:5–160:6.

207.    Société Générale also understood that Commerzbank would be compensating SCS in relation to the 2014 Transaction. Rosansky Dep. 114:15–115:4.

FILED UNDER SEAL—CONFIDENTIAL

208.    Without the 3 steps of the DAD transaction technology, Commerzbank's purposes for the 2014 Transaction would not have been achieved. Rosansky Dep. 167:25–169:6, 198:18-22; Sopkin Dep. 90:4–91:3.

209.    Although Commerzbank claims it had alternatives, it chose to use the same three steps in the same sequence and order as SCS presented because it suited Commerzbank's purposes. Kozak 68:10–70:7; Burrows 30(b)(6) Dep. 123:20–124:6.

210.    Both the 2013 and 2014 Transactions executed by Commerzbank had components that were "substantially similar" to the SCS presentation. Donohue 30(b)(6) Dep. 51:2-11, 52:5–53:25, 55:20–56:2; Sopkin Dep. 160:10–161:23.

211.    Commerzbank did not enter into a fee agreement with SCS prior to executing the 2013 Transaction. Sopkin Dep. 169:8-10.

212.    Commerzbank did not enter into a fee agreement with SCS prior to executing the 2014 Transaction. Sopkin Dep. 169:8-10.

213.    Commerzbank had an affiliate, Eurohypo New York branch that was about to be closed and was about to lose the ability to utilize over 900 million in net operating losses. Kozak Dep. 60:7–61:8; Sopkin Dep. 114:10–115:9.

214.    Hypothekenbank Frankfurt ("HF") is a wholly-owned subsidiary of Commerzbank. HF's New York Branch ("HF NY") had over $900 million in net operating losses. Read Decl. Exs. 14-16; Kozak Dep. 60:7–61:8; Sopkin Dep. 114:10–115:9.

215.    For approximately seven or eight years prior to the 2014 Transaction Commerzbank's Structured Capital Markets group had attempted to devise a transaction structure that would enable Commerzbank to move losses from HF NY to another entity. Burrows 30(b)(1) Dep. 19:9-16.

FILED UNDER SEAL—CONFIDENTIAL

216.    The banks' restructuring efforts relating to HF, and the wind-down of HF NY, were referred to internally as "Project Red Apple." Sopkin Dep. 114:10–115:9.

217.    As part of the 2014 Transaction, Commerzbank moved at least 140 million in net operating losses into an affiliate company, Eschborn, which was formed as a special purpose vehicle for the 2014 Transaction. Donohue 30(b)(6) Dep. 117:20-23; Donohue 30(b)(6) Dep. 118:13-23.

218.    A special purposes vehicle is a type of affiliate. Sopkin Dep. 89:14–90:3; Kozak Dep. 29:6-12.

219.    The execution of the 2014 Transaction allowed Commerzbank to preserve net operating losses it had in its Eurohypo New York branch which would have otherwise been lost when it was closed. Donohue 30(b)(6) Dep. 118:13-23; Kozak Dep. 60:7–61:8.

220.    The preservation of net operating losses has a value to Commerzbank. Sopkin Dep. 160:10–161:23.

221.    In June 2014, within a few months after the Eschborn entity had been capitalized, the value of Eschborn was reduced from $215 million to around 10.9 million. Read Decl. Ex. 23; Kozak Dep. 115:17–117:8, 118:14-25.

222.    Prior to June 2014, with over $215 million in assets, Commerzbank had sufficient assets in Eschorn to utilize the $140 million in losses, but instead stripped out the assets from Eschborn. Read Decl. Ex. 23; Kozak Dep. 115:17–117:8, 118:14-25.

223.    Currently, Commerzbank continues to have more than sufficient assets to monetize the net operating losses in Eschborn, but to date has chosen not to do so. Read Decl. (Donohue 30(b)(6) Dep.) 118:24–119:5.

FILED UNDER SEAL—CONFIDENTIAL

224.    Adam Parr and Paul Edwards met with Paul Burrows of Commerzbank in their London offices on 25 April 2013 and it was clear to them that Burrows was talking about the notional value of the 2013 transaction. Read Decl. Ex. 32 ¶44 (Edwards Decl.).

225.    SCS had no reason to believe Burrows was misleading SCS on the size of the 2013 transaction as SCS was still actively engaged in advising Commerzbank on the DAD, transaction technology still introducing counterparties to Commerzbank, and also introducing investment alternatives to utilize losses. Accordingly, SCS relied on Commerzbank's representation in negotiations with Société Générale. Read Decl. Ex. 32 ¶44 (Edwards Decl.); Read Decl. Ex. 33 ¶24-25 (Parr Decl.).

226.    Had SCS known the actual size of the 2013 Transaction, then it would never have settled with Société Générale for $675,000. Read Decl. Ex. 32 ¶44 (Edwards Decl.); Read Decl. Ex. 33 ¶25 (Parr Decl.).

227.    The DAD structure includes a capital markets transaction that involves the provision of finance and the taking of real credit risk by each party on the assets they each acquire, and between the parties on the performance of their deferred obligations.  Read Decl. Ex. 32 ¶5 (Edwards Decl.).

228.    The DAD structure presented to Commerzbank and Société Générale involves altering the investment and asset risk profiles of both parties.  Read Decl. Ex. 32 ¶6 (Edwards Decl.).

229.    The DAD structure presented to Commerzbank and Société Générale involves the management of certain risk dimensions through a variety of possible combinations of publically traded financial instruments.  Read Decl. Ex. 32 ¶7 (Edwards Decl.).

FILED UNDER SEAL—CONFIDENTIAL

230.    The DAD transaction presented to Commerzbank and Société Générale involves certain significant potential accounting impacts that substantially affect reported earnings, stated assets and stated shareholders equity.  Read Decl. Ex. 32 ¶8 (Edwards Decl.).

231.    SCS and Commerzbank representatives were present at the November 9, 2012 meeting which occurred in SCS offices at 230 Park Avenue, New York.  Read Decl. Ex. 32 ¶10 (Edwards Decl.).

232.    At the November 9, 2012 meeting SCS told Commerzbank that SCS was working with Société Générale who were also restricted and bound by an NDA with SCS, Sopkin acknowledged this and said Commerzbank was also in conversation with Larry Rosansky at Société Générale and would also be willing to enter IUDA with SCS.  Read Decl. Ex. 32 ¶11 (Edwards Decl.).

233.    On April 25, 2013 SCS attended a meeting with Paul Burrows and Peter Thompson of Commerzbank at Commerzbank's London offices.  At that meeting Paul Burrows represented that Commerzbank was the accommodation party to a $150,000,000 DAD Transaction with Société Générale – the 2013 Transaction.  Read Decl. Ex. 33 ¶22 (Parr Decl).

234.    As an experienced banking professional Paul Burrows would or should have known that other banking professionals would have understood Paul Burrows to be referring to $150,000,000 as the notional face value of the transaction.  Read Decl. Ex. 33 ¶22 (Parr Decl).

235.    On February 6, 2013 SCS attended a meeting with Nicholas Sopkin, Bill Donahue, Steven Horowitz and Leon Kozak of Commerzbank at Commerzbank's New York offices.  At this meeting SCS presented the Asset Acquisition Structures presentation, including the DAD Technology, to Commerzbank and provided additional detail of the financial asset

24

FILED UNDER SEAL—CONFIDENTIAL

capital markets transactions, as well as the accounting, regulatory capital and tax aspects of the DAD Technology.  SCS also answered questions raised by Commerzbank regarding the DAD Technology.  Read Decl. Ex. 33 ¶7 (Parr Decl.).

236.    There were additional meetings between SCS and Commerzbank after February 6, 2013.  At these meetings and conference calls SCS provided Commerzbank with further information regarding the DAD Technology and answered additional questions Commerzbank had regarding the DAD Technology.  Read Decl. Ex. 33 ¶8 (Parr Decl.).

237.    SCS's disclosure to Commerzbank included additional and different information than SCS's disclosure to SG.  Irwin Decl. Ex. 2 and 32.

238.    Donohue "did not have prior knowledge of the information in the 'Moving to Affiliate' or 'Security Arrangements' section" of SCS's presentation. (Donohue Decl. ¶ 9.)

239.    On February 6, 2013 Bill Donohue sent an email to Steve Horowitz in reference to a meeting with SCS and stated: "They have 2 ideas. […] Both work to pop a gain so we are half way there. Moving the loss down seems straight forward but leon hasn't weighed in yet. Interesting dynamic since it's not his idea."  Read Decl. Ex. 22 (Feb. 6, 2013 email).

240.    On February 7, 2013, just after receiving the disclosures from SCS, Nick Sopkin sent an internal email copying Leon Kozak and Bill Donohue stating they were working on a "different alternative" to moving HF NY Branch's losses.  Read Decl. Ex. 19.

241.    The IUDA between SCS and Commerzbank provides:  "NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, receipt of which is acknowledged by the parties, the parties agree as follows:" Read Decl. Ex. 1 ¶ (Jan 2013 IUDA).

FILED UNDER SEAL—CONFIDENTIAL

242.    On January 22, 2013, after signing the IUDA but before the SCS presentation, Nicholas Sopkin and Richard Wellens of Commerzbank exchanged  internal emails discussing coordination of efforts to make sure SCS is put on notice of all "carve-outs" from the IUDA for any information that may already be known by Commerzbank.  Read Decl. Ex. 20.

243.    SCS's "Asset Acquisition Structures" presentation stated it was: "provided […] under the terms of the confidentiality undertaking between SCS and Recipient."  Irwin Decl. Ex. 2.

244.    Under SCS's understanding all professional services firms, including law firms and CPA firms, such as Deloitte, were under professional obligations to maintain confidentiality of information disclosed by SCS for the purpose of seeking professional advice and opinion.  Read Decl. Ex. 32 ¶30 (Edwards Decl.).

245.    The information disclosed to AIG was subject to a confidentiality agreement between Deutsche Bank and AIG. (Read Decl. Ex. 32 (Edwards Decl. ¶ 22)). Tony Tuths represented to Mark McTigue that AIG and Deutsche Bank were operating under a broad NDA. (Read Decl. Ex. 35 (McTigue Dep. 69:13-24); Irwin Decl. Ex. 7. Further, presentation by Deutsche was marked as "strictly private and confidential"   Irwin Decl. Ex. 27 ¶.

246.    AIG and SCS formalized their oral confidentiality agreement in a written agreement in 2012.  *Id.*

247.    Commerzbank's expert witness has opined that "the SCS Presentation […] really does not describe a specific 'transaction' at all." (Tuths Decl. Ex. 1 at ¶ 85.)

248.    Commerzbank's expert witness opined that information about regulatory and accounting benefits is not "tax treatment" or "tax structure." (Tuths Decl. Ex. 1 ¶ 84.)

FILED UNDER SEAL—CONFIDENTIAL

249.    SCS disclosed its "Asset Acquisition Structures" presentation to Commerzbank in a January 29, 2013 email from Parr to Sopkin, Donohue, and Horowitz. The email stated: "This presentation is disclosed as Confidential Information pursuant to our Information Use and Disclosure Agreement dated January 14, 2013." Read Decl. Ex. 36.

250.    Larry Rosansky signed a Non-Disclosure agreement with SCS and required Commerzbank sign an NDA. Read Decl. Ex. 24 (NDA between SCS and SG); see also Read Decl. Ex. 25 (NDA between Commerzbank and SG).

251.    Mr. Rosansky expected the NDA with Commerzbank to apply to the mechanics of the DAD technology and that before Commerzbank would to proceed with or enter into a Transaction, Commerzbank would have to enter into a fee agreement. Read Decl. Ex. 4 221:18 – 223:14 (Rosansky Dep.).

252.    The transaction documents for the 2013 Transaction identify Commerzbank earning $11,489,000.  This includes the $100,000,000 of cash received at the trade execution date; plus the $1,211,489,000 of financial assets delivered 6 months later; less the $1,300,000,000 of financial assets Commerzbank sold to Société Générale.  Read Decl. Ex. 33, ¶20 (Parr. Decl).

253.    In conjunction with executing the 2013 Transaction, Commerzbank and Société Générale entered into a swap agreement.  The terms of this swap included a 0.159750% margin below the floating rate (i.e. a negative margin of 0.159750%) that is payable by Commerzbank.  A margin below the floating rate would result in the floating rate payer, Commerzbank, paying a lower rate and would thereby represent a benefit to Commerzbank. After taking into consideration the initial $4.29 million payment made by Commerzbank to

FILED UNDER SEAL—CONFIDENTIAL

Société Générale this benefit would total approximately $15.58 million over the 9.7 year term of the swap transaction.  Read Decl. Ex. 33, ¶21 (Parr. Decl).

254.    Commerzbank's March 6, 2013 draft of the "Tactics Approval Form" for the 2014 Transaction states: "Upon any transaction which generates taxable income in LLC, LLC, and the Commerzbank group, will recognize the full value of approximately USD 70m of DTAs which are currently written off." (Read Decl. Ex. 14.)

255.    Commerzbank's expert has opined that the notional value of a trade is a significant figure in calculating a fee. (Tuths Decl. Ex. 1 ¶¶ 129–131.).

256.    The DAD presentation provides much more than "tax treatment" and "tax structure".  Read. Decl. Ex. 34 ¶13 (Fuhrman Decl.).

257.    The SCS DAD presentation and subsequent oral communications between SCS and Commerzbank is confidential under the terms of the IUDA because a significant amount of the presentation and subsequent oral communications were with respect to particular capital markets transactions, as well as the accounting and regulatory aspects of the transactions. Read. Decl. Ex. 34 ¶18 (Fuhrman Decl.).

258.    The mere recital of tax provisions in a presentation or otherwise is not considered to be defined under US Treasury Regulation 1.6011-4(c)(8) and (9) as an item or statement of "tax treatment" or "tax structure".  Read. Decl. Ex. 34 ¶14 (Fuhrman Decl.).

259.    The standard confidentiality tax treatment and tax structure disclaimer language is typically included on structured finance presentations prepared by financial institutions even in cases in which the entity obtaining the presentation has executed a non-disclosure or confidentiality agreement with the financial institution. Read. Decl. Ex. 34 ¶15 (Fuhrman Decl.).

FILED UNDER SEAL—CONFIDENTIAL

260.    Commerzbank's internal March 6 and March 8, 2013 Tactics Approval documents for the 2014 Transaction contemplated a payment of $1 million dollars to SCS with whom Commerzbank had an "NDA in place regarding certain aspects of the [2014] transaction."

261.    On May 8, 2013 Nicholas Sopkin sent an email with a subject "NDAs" to Bill Donohue stating he didn't want to piss anyone off and that he was curious of how many others are talking about "the technology" and if he gets confirmation from Leon [Kozak] and Hershel whether "others" were speaking about the technology, to let SG and SCS know as an FYI and keep discussion with AIG quiet until SG finds out.  Read Decl. Ex. 18.

262.    A question was first raised in Commerzbank's Tactics Approval Forms for the 2014 Transaction about whether SCS should be paid on May 23, 2013.  Read. Decl. Ex. 14-16.

263.    The SCS DAD presentation and subsequent oral communications between SCS and Commerzbank is confidential under the terms of the IUDA because a significant amount of the presentation and subsequent oral communications were with respect to particular capital markets transactions, as well as the accounting and regulatory aspects of the transactions. Read. Decl. Ex. 34 ¶18 (Fuhrman Decl.).

FILED UNDER SEAL—CONFIDENTIAL

September 21, 2015                    Respectfully submitted,
Washington, D.C.


                                      ZERBE, FINGERET, FRANK & JADAV, P.C.


                                      By:   _____
                                            Felipe Bohnet-Gomez
                                            Jefferson Read
                                      1455 Pennsylvania Ave., N.W., Suite 300
                                      Washington, DC 20004
                                      (202) 888-7006
                                      fbgomez@zffjlaw.com


                                      *Attorneys for Plaintiff Structured Capital Solutions, LLC*